Mamie CROKER, Eric P. Travis, Chivis Davis, Sr., Robert W. DeBose and Leolin Dockins, Jr., Individually and on behalf of all others similarly situated

v.

The BOEING COMPANY (VERTOL DIVISION).

Civ. A. No. 71–2168.

United States District Court, E. D. Pennsylvania.

June 20, 1977.

Jeffrey A. Less, John F. Smith, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for plaintiffs.

Robert M. Landis, Jerome A. Hoffman, Mari M. Gursky, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

This class action was brought on behalf of black persons employed by the Vertol Division of the Boeing Company. ("Boeing Vertol" or "Company"). The plaintiffs alleged that the Company had engaged in racially discriminatory employment practices, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981, 1985. The action was bifurcated, and the liability issues were tried beginning on June 30, 1975, and concluding on October 6, 1975. At the outset of the trial, the parties notified the Court that the plaintiffs and the defendant Union (Local No. 1069 of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America) had reached a tentative settlement. The procedures of Rule 23 of the Federal Rules of Civil Procedure are now being implemented with regard to this settlement. Thus, this opinion concerns only the issue of the Company's liability for employment discrimination under the statutes cited above.

### FINDINGS OF FACT

I. Preliminary Facts

1. The Boeing Company is a corporation organized under the laws of the State of Delaware and doing business in the Commonwealth of Pennsylvania and the City of Philadelphia. Boeing Vertol, a division of the Boeing Company, is an employer engaged in interstate commerce, and maintains facilities in Ridley Township, Delaware County, Pennsylvania.

2. Plaintiffs Mamie Croker, Eric P. Travis, Chivis Davis, Sr., Robert W. Debose and Leolin Dockins are employed by Boeing Vertol as production and maintenance employees and are all members of the Negro race.

3. On or before June 19, 1968, plaintiffs Travis, Davis, Debose and Dockins each filed charges with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of their rights by both Boeing Vertol and the Union under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ·et seq. Plaintiffs Travis, Davis, Debose and Dockins were notified on December 21, 1971, of their right to bring suit in a United States District Court, and on January 11, 1972, they intervened as individual plaintiffs in this action.

4. On or about October 2, 1968, plaintiff Croker filed a charge with the EEOC alleging a violation of her rights by both Boeing Vertol and the Union under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

et seq. By letter dated August 6, 1971, the EEOC notified Ms. Croker that she was entitled to bring suit in a United States District Court, and she filed this action on September 2, 1971.

II. History and Description of Boeing Vertol

5. In March of 1960, the Boeing Company acquired the Vertol Aircraft Corporation, a company engaged in manufacturing helicopter aircraft. Since its acquisition by Boeing, Boeing Vertol has been primarily a helicopter manufacturer, with nearly all its output being purchased by the United States Department of Defense.

6. As a major government contractor, Boeing Vertol has had to comply with non-discrimination and affirmative action requirements. See 41 C.F.R. § 60-1 et seq. Boeing Vertol has been subject to annual audits of its employment practices and employment statistics by the Office of Federal Contract Compliance, ("OFCC"). The OFCC has never determined that Boeing Vertol should be prevented from obtaining government contracts.

7. Boeing Vertol has always had to compete with other helicopter manufacturers for defense contracts. In order to obtain contracts, the company must maintain quality and meet delivery schedules.

8. Quality is important because failure of a critical part may result in a crash. To ensure that there are no defects in workmanship, nearly ten percent of Boeing Vertol's manufacturing workforce is devoted to inspection. In addition, the overall skill and experience of the workforce is important.

9. Boeing Vertol's inability to meet delivery schedules has resulted in lost business in the past. Consequently, the constant need to meet schedules is a very important consideration in Boeing Vertol's production program.

10. Boeing Vertol, like other firms, must maintain reasonable costs to meet competition. Cost control requires that only essential production man-hours be used in the production process.

11. Boeing Vertol's efforts to maintain quality, schedules, and costs have affected its employment practices. Thus, Boeing Vertol normally hires employees for specific job openings, and whenever possible, it hires people of proven skill and experience. Boeing Vertol also has developed employment structures designed to accommodate varying production schedules and manpower needs.

12. The fact that nearly all of Boeing Vertol's business is with the Defense Department has caused fluctuations in the size of its workforce depending on the demands of national defense. Thus, Boeing Vertol employed less than 2500 persons in 1960, and approximately 12,500 in 1967. Total employment subsequently declined to approximately 5,200 by the end of 1972, and may be even lower at the present time. Varying Defense Department demands also have caused a great deal of employee movement within the plant as employees are hired, promoted, laid off or transferred. Because a great number of employees were hired between 1960 and 1963 and during late 1965 and 1966, these early years to a great extent determined the employment picture at Boeing Vertol until the present time.

13. The helicopter aerospace industry requires the services of scientists, engineers, finance personnel, computer and data processing staffs, and other skilled employees. Nearly two-thirds of the workforce consists of highly skilled employees.

14. For payroll administrative purposes, Boeing Vertol divides its workforce into five groups: general salary employees, production and maintenance employees ("P & M") (represented by the Union), guards and firemen (represented by separate unions), management, and other exempt salary employees. On the basis of functions, Boeing Vertol's workforce can be divided into three broad areas: Manufacturing, Engineering and Other (professional, office clerical and

service). These broad areas are further divided on the basis of various major and minor functions. In addition, employees are divided into labor grades by rate of pay. The 13 P & M labor grades represent a specific rate of pay, while labor grades for other employees represent a range of pay.

15. Engineering accounts for about twenty percent of Boeing Vertol's employees. This category includes engineering specialties, such as aeronautical, mechanical, and electrical engineering, and also employees in other scientific areas, such as physics and chemistry.

16. Manufacturing covers about sixty percent of the jobs at Boeing Vertol, and consists of all P & M jobs that are directly related to the actual manufacture of helicopters, including production and maintenance supervisors.

17. The remaining category of jobs ("Other") includes a variety of occupations ranging from traditional clerical positions to professional jobs. All of the jobs in this category are non-Engineering and are not subject to the collective bargaining agreement between the Company and the Union.

18. P & M jobs are by far the largest group within manufacturing, constituting between forty and fifty percent of Boeing Vertol's total employees. P & M employees have been covered by collective bargaining agreements between the Union and Boeing Vertol or its predecessors since 1956. Under the terms of the present agreement, there are more than 200 different job classifications, each of which has a labor grade assigned to it.

19. Job classifications are grouped into job occupations, which include both "A" and "B" classifications carrying different labor grades for the same occupation. Job classifications are also grouped into 61 job families on the basis of common functional skills. Some job classifications appear in more than one job family, and an employee in such a classification has promotional rights in all the job families in which his classification appears. The job family structure was introduced in 1956, and has been continued through all collective bargaining agreements since that time. The job families are divided between a manufacturing seniority unit and an inspection seniority unit. This separation reflects the independence of the quality control jobs, although there is no special reason for maintaining the separation. Openings in inspection jobs usually are filled by employees from the manufacturing unit rather than new hires. A job family structure such as the one at Boeing Vertol is the usual method of organizing P & M workers throughout the aerospace industry.

20. Learners are persons hired as P & M employees to train for a particular job classification. Learners receive a special rate of pay which progresses upward to the assigned rate for that job classification. At the end of a prescribed progression period, a learner must be promoted to the job for which he has been training, unless he has been terminated. A learner can be promoted by his supervisor before the end of this progression period, although there are no written standards concerning such promotions. Employment of learners is limited by the need to maintain quality control. Large numbers of learners can be hired only when production levels are sufficiently high to permit work to be broken down into simple functions.

21. A leadman is a P & M employee within one of the usual job classifications, who is paid an additional ten or fifteen cents per hour to perform some extra duties. Leadmen are selected by the first level supervisors. Although there are no written standards governing the selection process, the Company's description of the leadman position requires five or more years in the occupation. Supervisors exercise their own discretion in selecting leadmen, and seniority is not a factor.

22. Boeing Vertol's production units are organized on the basis of shops, with groups of shops forming a shop unit. Shops are headed by first-level supervisors, with general foremen above them, and superintendents above the general foremen. Some-

times a unit chief or manager is above the superintendent.

III. Hiring Procedures

23. Boeing Vertol exercises its own discretion in hiring new employees, since the hiring process is not controlled by any collective bargaining agreement. All persons are required to fill out applications before they are hired. Persons hired can be divided into "new hires" (persons who have never before been employed by Boeing Vertol) and "rehires" (persons who previously have been employed by the Company).

24. When a person is hired he receives a "company service date" based on his date of hire. Company service dates are adjusted upwards to reflect any time the person was off the payroll, and they are based on an employee's most recent date of hire, even if the employee is a rehire. Similarly, seniority dates for P & M employees are based on the date of an employee's most recent hire. Although company service dates are adjusted upwards for the time an employee is on layoff, P & M seniority dates are adjusted only for time in which an employee does not accrue seniority. Since P & M employees accrue seniority while on layoff, an employee's seniority date can differ from his adjusted company service date. Under the collective bargaining agreement, a person who is rehired is treated as if he were a new hire, since he gets no credit for past service with the company. Employees who are laid off retain recall rights for a certain period of time. If an employee is recalled during this time, he is not a rehire, but simply a recalled employee. In other words, he retains his former seniority date.

25. If a job opening at Boeing Vertol is not filled by a present employee, a requisition notice is sent to the employment office. The requisition notice, especially for non-P & M jobs, sets forth the job requirements and qualifications as determined by the supervisor. For P & M jobs, written job descriptions for every job classification already exist and they establish the training and experience requirements for each job.

Until 1973, a supervisor could name on the requisition notice a suggested candidate for a vacancy. One reason for discontinuing this practice was its potential for bias against minorities.

26. In order to fill job vacancies, Boeing Vertol sometimes placed newspaper advertisements for particular job classifications. These advertisements usually stated a specific number of years of prior experience as a requirement for employment.

27. Persons who come in to the employment office are advised by a receptionist of any job openings that might fit their background. Some of these persons then are interviewed by personnel interviewers in the employment office, who review their applications and advise them of job openings related to their qualifications. Other persons may not be interviewed and may not even file applications, since they may leave if the receptionist tells them there are no openings to fit their qualifications.

28. The Company keeps employment applications on file for at least one year, and these applications are supposed to be considered for any job openings within a year following the date of application. In practice the evidence showed that most positions are filled by persons who applied within a few days of the date they are hired.

29. The employment office refers applicants to the supervisor who has the job opening, and the supervisor normally makes the actual decision as to who will be hired, after interviewing the candidates. In making this decision, line supervisors essentially rely on their own subjective judgment.

30. An employee is placed into a particular job family on the basis of the job classification he is hired into. Most applicants specify a particular job or occupation in their application for employment, and most new employees receive that job choice. However, a particular job choice may be specified only because the interviewer or receptionist told the applicant that that job was available.

31. Testing has never been an important factor in determining who will be hired at Boeing Vertol. Testing for P & M jobs was discontinued in 1962. Other written testing was discontinued in 1968 because an internal company study indicated that the tests might not be accurate and might adversely affect minorities, and the Company could not justify the expense of validating the tests.

32. An internal company study conducted in 1973 concluded that there was inadequate documentation to evaluate the performance of line supervisors in matching an applicant's qualifications to job requirements.

33. No validation studies have been performed on the Company's P & M job descriptions, experience requirements, selection criteria or methods, or any employment tests.

IV. Promotion and Transfer Procedures

34. For P & M employees, promotion and transfer is controlled by the collective bargaining agreement between the Company and the Union. When a job opening occurs in any job classification, employees who have a right to the job must be considered first. This category includes employees who previously have been bumped out of the job and employees who are on layoff but still have recall rights. If there are no employees in this category, then persons must be considered for the opening in the following order: (1) employees in a lower job classification within the same job occupation; (2) employees in the next lower job classification within the same job family, with employees in each job classification separately considered before those in a lower job classification are considered; (3) employees who have filed written promotion requests; (4) employees who have filed written lateral transfer requests; (5) new hires. Within each category, employees are considered in an order based on plant-wide seniority. Employees in the lower ranking groups will not be considered at all once the available openings have been filled.

35. Employees outside the job family where the vacancy occurs are not considered unless they previously have filed promotion or transfer requests. A written promotion request can only be filed for a job classification with a higher labor grade in a different job family. A lateral transfer request can only be filed for a job classification with an equal labor grade in a different job family. A transfer request is not considered until ten days after it is filed. Since February, 1973 P & M employees also can request transfer to a lower graded job in a different job family. Both promotion requests and lateral transfer requests are valid for one year, although they may be refiled when they expire. Before 1968, an employee could have only two requests of each type pending at any time. Since 1968, an employee can have four requests of each type pending at any time. A promotion request becomes void if an employee's status changes so that transfer to the requested job would not give the employee a higher labor grade. Similarly, a promotion to a higher labor grade or the granting of one transfer request voids any other pending lateral transfer requests. After a promotion review list has been issued for a particular job vacancy, no new promotion or lateral transfer requests are considered for that vacancy. Because there may have been a problem with supervisors failing to file promotion and transfer cards for employees, in November of 1968 procedures were changed to provide that a copy of the request be returned to the employee after filing. An advantage of the Company's promotion and transfer policies is that employees can be considered for P & M positions when a vacancy occurs, without having to continually check job postings to determine if a vacancy exists.

36. Job vacancies are not posted at Boeing Vertol, although the Union has always requested job posting. Nevertheless, some employees may learn of vacancies from supervisors or through the grapevine and so be able to file a promotion or transfer request for a particular opening.

37. The general procedure when a job vacancy occurs is for the first level supervisor to notify the manpower control office. That office then issues a promotion review list setting forth in sequence the groups of employees who are to be considered for that job. Usually, the supervisor reviews the promotion review list and makes the selection. The supervisor's choice depends primarily on his own subjective judgment. After the supervisor makes his selection, he returns the marked up promotion review list to the manpower control office, which processes the changes.

38. In making a selection, the supervisor rates the employees within a group on their interest and qualifications for the job. The supervisor's selection is based on his knowledge of the employee and the requirements of the job to be filled. According to the collective bargaining agreement, a P & M opening is to be filled on the basis of skill and ability, with seniority being given full consideration and prevailing when skill and ability are equal. Since a person with less seniority may have more skill and ability, the most senior employee in the group being considered should not always be selected, even if he has the basic qualifications. In most cases, however, the most senior employee is selected.

39. Although the supervisors have a great deal of discretion in filling vacancies, certain restraints are built into the system. A first-line supervisor is accountable if his unit fails to meet production demands. Consequently, it is in his interest to see that the best employees are promoted. Supervisors may have to justify their promotion decisions to employees who were passed over, and other employees. In addition, foremen and general foremen also have to justify their promotion and transfer decisions to the Labor Relations office and the Human Relations office if a grievance is filed. When a grievance is filed, a Labor Relations representative reviews with the supervisor his reasons for denying the promotion, and attempts to insure that the right employee is promoted. The Company is motivated to monitor the promotion process carefully, because it can be liable for an award of back pay if the wrong person is promoted.

40. The Company performed a study of all promotion review lists used in 1972. In that year, 115 employees (11 blacks, 104 whites) were promoted. 28 employees (6 blacks, 22 whites) were passed over as not interested, and 9 employees (all white) with more seniority were passed over because their supervisors rated them as insufficiently qualified.

41. A P & M employee can change job families only by means of a promotion or transfer. When an employee does change job families, he retains his accumulated seniority after the promotion or transfer. There is no policy against transfer between job families, and in fact, many employees do change job families.

42. Certain general practices are followed in the promotion and transfer of non-unionized employees, although no collective bargaining agreement defines these procedures. Before November of 1973, these procedures were very informal. Generally the supervisor with the vacancy would consider employees within the same minor function for the vacancy, then employees in related minor functions within the same major function, then employees in related major functions, then employees in other major functions, and finally new employees. Job openings were not posted, and there was no bidding procedure or systematic review of potentially qualified employees.

43. Since November, 1973, vacancies in non-unionized jobs are filled according to new written guidelines. These provide that after employees with recall rights, employees in the next lower grade classification within the same major function are considered, followed by employees with pending transfer requests. If the opening has not been filled from employees in these groups, then the job opening is posted and any employee in the plant can apply and will be given equal consideration for the position.

44. The decision concerning who will be selected to fill an opening depends on the subjective judgment of the supervisors, who determine the job requirements and needed qualifications. The job descriptions for non P & M jobs are not kept up to date and have never been validated.

45. Since 1973, promotions and transfers in engineering jobs have been decided on the basis of an employee's education and experience, and his demonstrated proficiency in completing work assignments. Job openings in the engineering area generally have been publicized by the Company. The plaintiffs presented no evidence showing that black engineers received fewer promotions than whites. In fact, as early as 1967, minority engineering employees who had the potential for advancement were specially identified.

46. Supervisors in engineering are chosen primarily on the basis of proven technical ability, although the selection procedures must remain flexible because the duties of an engineering supervisor vary with changing design schedules. Candidates for supervisory positions in engineering are reviewed by at least two managers and often by the Director of Engineering.

47. Management positions at Boeing Vertol traditionally have been filled by promotion from within the Company rather than by hiring new employees as managers. Thus, P & M supervisors normally are promoted from employees in the P & M unit. There are no written standards governing the promotion of employees to supervisory positions, although an employee's rate of progression since being hired is one factor that is considered. Other factors normally considered include desire to be a manager, ability to get along with people, experience in a "lead" capacity, personal contacts, respect of peers, personal habits, attitude toward the Company, and knowledge of the organization and product.

48. Since 1963, all employees promoted to supervisory positions must be approved by a Supervisory Selection Board. The members of the Board are high level production superintendents. The Board considers each candidate's background and experience against the job requirements in order to decide which candidate to recommend, and its decision is made by majority vote. Normally the shop with the opening nominates several candidates for consideration. However, in instances where the superintendent with the opening does not know a well qualified person from another shop, the Board might recommend a candidate who was not nominated originally by the shop with the opening. Employees also sometimes nominate themselves for a supervisory opening, although there are no special procedures for self-nomination.

49. Beginning in April, 1967, the Supervisory Selection Board was required to consider black candidates whenever a supervisory position was to be filled. Company supervisors and foremen were urged to identify minority employees who should be considered for promotion. Although there were no blacks on the Supervisory Selection Board, starting in 1967 black management employees participated in Board meetings to assist in consideration of black candidates, and since 1973, a representative of the Human Relations Office frequently attended Board meetings.

50. The collective bargaining agreements provided for a freeze on supervisors' seniority that was in effect from 1965 to 1971. During that time, a P & M employee who was promoted to a supervisory position retained his P & M seniority but did not accumulate additional seniority while he was a supervisor. This policy discouraged employees from accepting supervisory positions, particularly after 1967 when the Company's employment began to decline.

51. In 1972, Boeing Vertol reviewed its method of selecting supervisory personnel. This study concluded that the selection process relied too much on the unsupported opinion of line managers and that the process excluded many potential candidates from consideration and had the inherent

weakness of perpetuating individual bias. The supervisory selection committee recommended that a procedure be established for self-nomination in order to assure consideration of a broader group of employees. The committee also criticized the restrictive membership of the selection boards, and noted the lack of clarity concerning job requirements and duties of first line managers. The lack of clarity causes selection criteria to vary depending on who is making the selection, and also makes it difficult to evaluate the selection process. Finally, the selection committee noted that personal preference was the most common basis for selecting supervisors, even though decisions based on preference may overlook skill requirements and permit discrimination purposely or inadvertently.

## V. Reductions in Force

52. A reduction in force is necessary whenever there are too many employees in a particular job classification. For P & M employees, the collective bargaining agreement provides that learners and probationary employees are laid off first (no matter what their seniority), followed by the least senior employee in the job classification. Such an employee has the option of taking a position in the next lower job classification within the job family if there is an employee with less seniority who can be bumped. Although an employee can bump down through all the job classifications within his job family, he cannot bump an employee in another job family, no matter how great his seniority. However, if a surplus employee has been unable to bump any employee in the job classifications within his job family, he can enter the labor pool if he has more seniority than the least senior employee in that unit. If an employee who bumps down is unable to perform adequately, he may be placed on layoff status, at which time he forfeits recall rights. If a surplus employee cannot find another position by bumping another employee, then he will be laid off. Of course, an employee can choose to be layed off instead of bumping

down to a lower job classification, and a surplus employee layed off either voluntarily or involuntarily retains recall rights and rights to his old job. A P & M employee with five or more years seniority has recall rights up to five years, and other P & M employees have recall rights up to three years.

53. Layoffs of non-unionized employees are not controlled by a written agreement. Nevertheless, non-unionized employees have informal recall rights, and seniority is an important factor in deciding who will be laid off.

## VI. Discipline Procedures

54. Records of reprimands and disciplinary actions are kept by means of employee reports, which are issued by first level supervisors in the P & M unit. Discipline is on a progressive system, from oral warnings, to reprimands, disciplinary actions, and discharges, although immediate discharges may be given for serious infractions. There are no written standards concerning the issuance of employee reports, so that the subjective judgment of the supervisor is controlling. The goal of the Company's disciplinary system is to provide employees with an opportunity to correct deficiencies in work or behavior.

55. Employee reports are signed by the affected employee, and copies are placed in the employee's central personnel folder and the employee's shop folder, which is kept by his supervisor. In addition, the employee himself gets a copy. If an employee does not receive an employee report for a period of ten months, all preceding employee reports should be expunged from his record, and notices to expunge are sent to the Personnel Department and to the relevant shop supervisor. However, there is no system to check if the reports actually are removed from the shop files, and in fact, some employee reports are not removed and may be considered improperly. In making promotion and transfer decisions, supervisors may consider any and all employee reports in the employee's file, although re-

ports based on workmanship are given primary consideration.

56. To insure that the disciplinary system is as fair as possible, Company rules are posted so that employees should know them, and the rules specify the appropriate punishment for particular kinds of behavior. Disciplinary actions must be cleared through the Labor Relations office, which attempts to insure a uniform application of disciplinary rules. Thus, a supervisor cannot write an employee report and put it in an employee's official file without getting the approval of a Labor Relations representative.

57. The most common cause for issuing an employee report is absence from work. Attendance data is collected in the Company's computer system, which records the times that employees clock in. Each day an Exception Report is prepared which lists those employees who are absent or late. Exception Reports are verified by supervisors, and Exception Reports are consulted before an employee report is issued on the basis of attendance. Actual issuance of an employee report on the basis of attendance is in the discretion of the supervisor.

58. Because discipline was a serious problem in the late 1960's, the Company began a practice of not giving disciplinary layoffs if the reason for the layoff was absenteeism. The Company also instituted a special procedure in 1968 to insure that blacks were represented in disciplinary cases which could lead to discharge. In addition to a black representative on behalf of the union, a black employee would attend the hearing on behalf of management. The Company's administrative procedures also provided that claims of discrimination would be investigated by the Human Relations Department.

## VII. Statistical Evidence—Hiring

59. Plaintiffs' statistical expert was Dr. John DeCani, Chairman of the Department of Statistics at the University of Pennsylvania. Dr. DeCani discussed the statistical significance of various disparities between whites and blacks at Boeing Vertol. According to Dr. DeCani, a disparity is statistically significant if it is not attributable to chance based on a probability standard of five percent or less.

60. The percentage of Blacks as part of the total number of employees at Boeing Vertol has varied from a low of 4.0 percent in 1962 to a high of 8.4 percent in 1968. Since 1968, the percentage of Blacks has declined somewhat.

61. Boeing Vertol is located within the Philadelphia Standard Metropolitan Statistical Area (SMSA), and the Philadelphia SMSA is an appropriate geographic area to use for census comparisons. In the Philadelphia SMSA in 1970, Blacks made up 17.5 percent of the total population and 16.14 percent of the civilian labor force over 16 years of age.

62. There is a statistically significant disparity unfavorable to blacks between the percentage of blacks employed at Boeing Vertol between 1962 and 1973 and the percentage that should be expected according to the percentage of blacks in the Philadelphia SMSA.

63. However, a comparison of the racial composition of the persons actually hired and the Philadelphia SMSA yields different results. Of the total number of P & M hires between 1965 and 1974, 17.9 percent were black. Between 1965 and 1968, 16.6 percent of P & M hires were black. These figures exceed the percentage of blacks in the Philadelphia SMSA work force (16.14 percent). The percentage of black P & M hires for individual years exceeded the percentage of blacks in the Philadelphia SMSA in 1967, 1968, 1969, 1971, 1973 and 1974, and exceeded the percentage of blacks in Delaware County in 1965, 1966, 1967, 1968, 1969, 1971, 1973 and 1974.[1]

---

1. The total number of hires was too small in 1970 and 1972 to be statistically significant.

For total Company new hires since 1970, the percentage of blacks was as follows:

| | All Races | Black | Percentage Black |
|---|---|---|---|
| 1970 | 40 | 3 | 7.5 |
| 1971 | 208 | 29 | 13.9 |
| 1972 | 233 | 29 | 12.4 |
| 1973 | 581 | 82 | 14.1 |
| 1974 | 631 | 144 | 22.8 |
| TOTAL | 1693 | 287 | 16.9 |

64. The plaintiffs presented evidence comparing the racial composition of the persons hired and the persons applying for administrative and office positions. The earliest data available for office and administrative applications was for 1971, and showed that 27.6 percent of the applicants for such positions were black, while only 9 percent of those hired were black. Based on the actual black hiring rate for office and administrative positions in earlier years, similar disparities adverse to blacks would exist unless the black application rate was far lower than the 27.6 percent actually recorded in 1971.

The actual percentages of black administrative and office new hires since 1971 were as follows:

| | All Races | Black | Percentage Black |
|---|---|---|---|
| 1970 | 12 | 1 | 8.3 |
| 1971 | 65 | 8 | 12.3 |
| 1972 | 161 | 17 | 10.6 |
| 1973 | 110 | 22 | 20.0 |
| 1974 | 181 | 37 | 20.4 |
| TOTAL | 529 | 85 | 16.1 |

65. The plaintiffs presented evidence comparing the racial composition of the persons hired and the persons applying for P & M positions:

| | Total hired | Negro Hired, Percent | Negro Applied, Percent | Smallest Negro Application Rate which would indicate a significant disparity adverse to Negroes in hiring |
|---|---|---|---|---|
| 1960 | 256 | 4.7 | (Unknown) | 7.5 |
| 1961 | 995 | 6.4 | " | 8.0 |
| 1962 | 1490 | 6.5 | " | 8.0 |
| 1963 | 1941 | 6.5 | " | 7.5 |
| 1964 | 482 | 5.0 | " | 7.0 |
| 1965 | 1537 | 10.7 | " | 12.5 |
| 1966 | 3635 | 14.9 | " | 16.5 |
| 1967 | 1634 | 20.2 | " | 22.0 |
| 1968 | 990 | 26.6 | 33.1 | 29.0 |
| 1969 | 543 | 20.4 | 36.0 | 23.5 |
| 1970 | 33 | 9.1 | 31.2 | 22.0 |
| 1971 | 77 | 32.5 | 37.3 | 41.0 |

The last column on the above table provides figures calculated by Dr. DeCani representing the smallest hypothetical application rates which would reflect a statistically sig-

nificant disparity adverse to negroes based on the percentage of negroes actually hired. Although the percentage of applicants who were negroes is unknown for years before 1968, the hypothetical application percentages show that a significant disparity adverse to negroes would exist unless the actual percentage of negro applicants was far lower than 31.2 percent, the lowest actual negro application rate recorded in any year. For years where the actual application rate was available, a statistically significant disparity adverse to blacks was present in 1968, 1969 and 1970.

66. Boeing Vertol's 1973 and 1974 affirmative action reports to the United States government set forth the availability of minority group members for various categories of employees, using a national recruiting area for management and professional or technical employees, and the Philadelphia SMSA for all other employees:

| Minority Availability | | |
|---|---|---|
| | 1973 | 1974 |
| Management | 4.7 | 3.7 |
| Exempt Prof./technical | 3.2 | 4.6 |
| Exempt administrative | 7.2 | 7.5 |
| General salary | 14.2 | 13.7 |
| P & M | 14.2 | 20.7 |
| Total work force | 10.3 | 15.2 |

The Company's 1973 Report showed that minorities were underutilized in all major categories in 1972. The Company itself admitted in its 1970 and 1971 reports that minorities were underutilized in most occupational categories.

67. The plaintiffs presented evidence concerning Boeing Vertol's utilization of blacks in various categories of employees:

| | Negro Percentage of Management Payroll | Negro Percentage of Technical & Administrative Payroll | Negro Percentage of General Salary Payroll | Negro Percentage of P & M Payroll |
|---|---|---|---|---|
| 1965 | 0.2 | 1.0 | 1.5 | 7.8 |
| 1966 | 0.2 | 0.9 | 1.8 | 11.0 |
| 1967 | 0.8 | 0.9 | 2.7 | 12.8 |
| 1968 | 1.0 | 1.1 | 3.8 | 14.2 |
| 1969 | 0.9 | 1.1 | 4.5 | 13.0 |
| 1970 | 1.3 | 1.0 | 3.1 | 9.0 |
| 1971 | 1.4 | 0.8 | 5.3 | 8.0 |
| 1972 | 2.4 | 1.7 | 5.8 | 9.0 |
| 1973 | 3.3 | 3.0 | 6.6 | 10.1 |

68. The plaintiffs also presented statistics on the utilization of minorities in certain categories of employees between 1962 and 1964:

| | Percentage of Minorities in Management Payroll | Percentage of Minorities in office and clerical jobs |
|---|---|---|
| 1962 | 1.35 | 2.39 |
| 1963 | 0.395 | 2.913 |
| 1964 | 0.312 | 2.99 |

69. The utilization statistics generally show that much smaller percentages of blacks or minorities were employed by Boeing Vertol between 1962 and 1973 than were available by the Company's own estimates in 1973 or 1974. Of course, minority availability could have been lower before 1973, since no estimates were made before that year. I also note that the 1973 and 1974 estimates pertained to all minorities,

while the utilization data provided above for 1965 to 1973 pertained only to blacks.

70. At trial, the Company presented a labor market availability and manpower utilization analysis performed by Dr. Seymour Wolfbein, Professor of Economics and Dean of the School of Business Administration at Temple University. Dr. Wolfbein is a nationally recognized manpower expert, with wide experience in the fields of manpower utilization, labor employment patterns and labor statistics. The type of analysis performed by Dr. Wolfbein is used by governmental agencies and manpower experts to determine if minorities are underutilized in terms of their availability.

71. In performing his analysis, Dr. Wolfbein first grouped the various jobs existing at Boeing Vertol from January 1, 1963, through December 31, 1974 into standard occupational classifications. Then he compared the Company's utilization of blacks with the expected utilization rates based on the availability of blacks in the appropriate labor market.[2] In terms of geographic areas Dr. Wolfbein used the Philadelphia SMSA or the entire United States, whichever had the highest percentage of blacks for the particular occupation.

72. Dr. Wolfbein calculated the availability of blacks in various occupations on the basis of census figures showing the percentage of blacks among those employed in that occupation. These figures did not include persons who might have been qualified for a particular occupation, but were listed as unemployed by the census. Including these persons would have increased the percentage of blacks available in many occupations. In calculating the Company's utilization rates for particular occupations, Dr. Wolfbein did not include employees classified as learners, although persons who originally had begun as learners but had been promoted to regular positions were included. Consequently, the utilization rates include persons who were trained by the Company, while the availability rates include only persons who were employed in a particular occupation.

73. Dr. Wolfbein did a detailed analysis for the years 1968, 1970 and 1974. (See Defendant's Exhibits 4, 5 and 6). According to his calculations, ideal utilization of blacks (i. e. utilization of blacks equal to their availability) would have resulted in a black employment percentage of 7.20 percent, 6.93 percent and 6.5 percent in each of those respective years. The actual black employment for the occupations analyzed was 7.38 percent, 5.31 percent and 8.4 percent respectively. Although actual utilization of blacks sometimes fell below the ideal for particular occupations, these occupations were distributed across all occupational groups, so that there was no evidence of any pattern of discrimination. Based on the results of the manpower utilization analysis, Dr. Wolfbein concluded that there was no evidence of any pattern of racial discrimination at Boeing Vertol in the period 1965 through 1974.

74. Plaintiffs presented evidence based on Dr. Wolfbein's analysis which pointed out the particular occupational categories in which blacks were underutilized by Boeing Vertol. Underutilization of blacks was statistically significant for one or more years between 1965 and 1971 in the following occupations: "painters," "checkers, examiners and inspectors," "other craftsmen and kindred," "other metal craftsmen," "machinists, job and dye," "other clerical," "secretaries, steno and typists," "secretaries," "office machine operators," "other professionals, technical and kindred," and "guards and watchmen."

75. The plaintiffs also presented the testimony of Dr. Marc Rosenblum, a labor economist, who further analyzed the occupational categories that had been used by Dr. Wolfbein. Dr. Rosenblum included ex-

---

2. Dr. Wolfbein's analysis covered approximately 90 percent of the Company's workforce, including engineering, P & M, and other occupations. Laborer and service occupations were not analyzed, since blacks traditionally are relegated to these occupations. Learners were not analyzed, since there was no meaningful comparative labor market.

perienced unemployed persons in his analysis. After combining census occupational categories into broader standard groupings, Dr. Rosenblum testified to statistically significant disparities adverse to blacks in these occupational groupings:

| | Total Company Employment | Actual Negro Company Employment | Expected Negro Company Employment |
|---|---|---|---|
| **1966** | | | |
| Clerical | 1799 | 76 | 229 |
| Operatives (except transport) | 3214 | 314 | 469 |
| Guards | 93 | 4 | 21 |
| **1968** | | | |
| Clerical | 1834 | 124 | 230 |
| Operatives (except transport) | 3304 | 439 | 481 |
| Guards | 82 | 3 | 18 |
| Professionals | 2940 | 50 | 82 |
| **1970** | | | |
| Clerical | 807 | 31 | 104 |
| Operatives (except transport) | 1448 | 141 | 216 |
| Professionals | 1373 | 20 | 33 |
| Guards | 31 | 1 | 7 |

In Dr. Rosenblum's opinion, the disparities shown in the above tables indicate an underutilization of blacks in these occupational areas. Moreover, the underutilization may be understated, since several of the categories do not take into account the transferability of skills from other census categories.

76. The defendant presented statistical evidence through Dr. William C. Stewart, Professor of Statistics at Temple University. Dr. Stewart measured changes in the percentage of black employees within each standard census occupation that occurred between 1965 and 1974. Dr. Stewart found that the percentage of black employees in the various occupations increased from one year to the next far more often than it declined. Dr. Stewart concluded that in the period 1965 to 1974 there was a statistically significant upward trend of black employment at Boeing Vertol, spread across all Census occupational groupings. The only exception to this upward trend were in the two lowest Labor Grades (1 and 2) and in Labor Grade 11. The increases in black employment were especially pronounced between 1965 and 1968, a period in which the Company's employment increased substantially. During this period, blacks represented approximately 19 percent of all new employees.

77. In addition to analyzing employment statistics, Dr. Stewart also performed a study of work transportation patterns in the area where Boeing Vertol is located, based on the 1970 Census Urban Transportation Planning Package. This study showed that few people from Philadelphia work in Delaware County. Most people who work in Philadelphia use public transportation, while most people who work in the Ridley Township area drive to work because of the inadequacy of public transportation. Other evidence showed that approximately 60 percent of Boeing Vertol's

employees reside in Delaware County. This evidence indicates that statistics on the availability of blacks in the Philadelphia SMSA may overstate the actual availability of blacks to Boeing Vertol, since a large proportion of the available black employees in the Philadelphia SMSA live in the City itself, while the workforce in Delaware County is only 6.7 percent black.

78. The learner program at Boeing Vertol provided on the job training by regular employees and supervisors. Through this program, the Company successfully trained a large number of employees who had little or no prior experience. Since learners made up a significant part of the total P & M workforce from 1960 to 1968, many of the regular employees after that time originally had been hired as learners. The racial composition of the learners from 1963 to 1974 was as follows: [3]

| | Total Learners | Percent Negro |
|---|---|---|
| 1963 | 132 | 3.0 (minority) |
| 1964 | 142 | 0.7 (minority) |
| 1965 | 449 | 8.0 |
| 1966 | 735 | 12.0 |
| 1967 | 548 | 20.25 |
| 1968 | 337 | 27.89 |
| 1969 | 25 | 40.0 |
| 1973 | 5 | 20.0 |

79. For each year from 1963 through 1966, there is a statistically significant disparity adverse to blacks between the rate of black participation in the learner program and the percentage of blacks in the civilian workforce in the Philadelphia SMSA. On the other hand, of the total number of learners hired between 1965 and 1968, 16.18 percent were black. This percentage exceeds the percentage of blacks in the civilian workforce in the Philadelphia SMSA (16.14 percent) and in the Delaware County workforce (6.27 percent).

80. The plaintiffs presented rebuttal testimony through Dr. Rosenblum concerning the appropriate labor market for the

Company's learner jobs. Based on the fact that in a study of several hundred learners, more than 80 percent were between the ages of 20 and 34 and had attained between 1 and 4 years of high school, Dr. Rosenblum limited the labor pool to persons with these characteristics. Including an adjustment for census undercounting, Dr. Rosenblum concluded that blacks constituted 24.7 percent of the available workers for learner jobs. In calculating this figure, Dr. Rosenblum arbitrarily defined the labor market in terms of age and education, and he did not determine if the learners he analyzed were representative of the entire learner program.

81. A comparison of the learner workforce at Boeing Vertol to the labor market as defined by Dr. Rosenblum indicates a statistically significant disparity adverse to blacks in every year from 1963 through 1967. In addition, the percentage of blacks in the learner program in each year from 1963 through 1968 is well below the percentage of blacks among the persons who actually applied for jobs at Boeing Vertol in 1968 (33.1 percent).

82. Boeing Vertol has made various efforts to recruit more black employees. The Company has contacted black-oriented organizations such as the Opportunities Industrialization Center, the Urban League, the Council for Equal Job Opportunity, and even the EEOC, and has on occasion notified these organizations of its manpower needs and openings. Boeing Vertol has placed advertisements in predominantly black circulation news media for positions such as secretaries. In 1968 the Company participated in a special Program of the Department of Labor designed to provide jobs for "hard core" unemployed. Approximately 100 such employees, many of whom were black, were placed in P & M positions. The Company worked with the Chamber of Commerce, the National Alliance of Businessmen and the Chester Neighborhood Youth Corps to provide training, guidance

**3.** No learners were employed in 1970, 1971, 1972, or 1974. The figures for 1963 and 1964 are for "apprentices and trainees," a classification that may have been somewhat different from the learner program that began in 1965.

and jobs to young people and hard-core unemployed. The Company also participated in a joint program with the predominantly black Simon Gratz High School in Philadelphia. This program was designed to demonstrate to black students that blacks could escape the inner city and work in large industrial establishments. However, apparently only one participant in this program was ever hired by Boeing Vertol.

83. In order to increase the supply of housing for blacks in its immediate area, Boeing Vertol obtained pledges of non-discrimination from local relators who advertised in any Company communication media.

84. Boeing Vertol has had difficulty in recruiting black engineers, primarily because of the small number of black engineering graduates. Many of the Company's engineering jobs require backgrounds in basic engineering as well as knowledge of engineering specializations. Candidates for advanced engineering positions are expected to have an engineering degree and advance training or experience. The demand for black engineers meeting these requirements far exceeds the supply. Statistics from organizations such as the Engineering Manpower Commission and the College Placement Council show that minorities, including blacks, made up only 1.3 percent of all engineering graduates in 1974. The United States Census reported that between .9 and 3.3 percent of the persons employed in various engineering fields in 1970 were black males.

85. Since 1970, the percentage of blacks among total engineering new hires was as follows:

| | All Races | Black | Percentage Black |
|---|---|---|---|
| 1970 | 3 | 0 | 0.0 |
| 1971 | 38 | 0 | 0.0 |
| 1972 | 45 | 11 | 24.4 |
| 1973 | 134 | 8 | 6.0 |
| 1974 | 42 | 6 | 14.3 |
| TOTAL | 262 | 25 | 9.5 |

86. Boeing Vertol has made special efforts to attract black engineering graduates. As early as 1963, the Company's recruitment teams regularly visited predominantly black engineering schools such as Howard University and Hampton University. The Company emphasized that it was an Equal Employment Opportunity employer and encouraged applications from qualified minority persons. Boeing Vertol stressed the same theme in its advertising. Furthermore, it advertised in black-oriented media such as *The Philadelphia Tribune, Project Magazine* and *Ebony,* and listed its engineering openings with black employment agencies and other sources. Beginning in 1974, the Company instituted a program in which black high school graduates were given financial help and work exposure to stimulate their interest in engineering studies.

87. In 1974, Boeing Vertol recruited at over 33 colleges and made 33 engineering job offers, of which 5 were to black candidates. Between 1970 and 1974, nearly ten percent of all engineers hired were black.

## VIII. Initial Placement and Racial Distribution within the Workforce

88. Plaintiffs claim that those blacks who were hired were placed in lower labor grade than whites. For all new hires into P & M positions in 1967 (over 1300 persons) the median labor grade for whites was grade 6, and for blacks, grade 5.

89. Analyses of 50 whites and 50 blacks hired in 1962 and in 1966 and selected at random[4] revealed that persons hired as learners were placed in higher labor grades than non-learners. They also showed that persons with a high school education were more likely to be selected as learners than persons without a high school education. In addition, the 50/50 studies generally

---

4. Dr. DeCani did not include rehires in his analysis of the 50/50 studies. A rehire may be treated differently in terms of assignment and promotion than a new hire with the same seniority date, because a rehire has prior experience at Boeing Vertol that is not reflected in his seniority date.

showed that blacks were placed in lower labor grades than whites.

90. The Company presented an analysis of the initial placement of employees hired in 1971 which showed that the differences in placement between blacks and whites were due primarily to different job preferences, since most new hires were placed according to their choice. For example, Boeing Vertol hired 19 plumbers in 1971. All of these employees had prior plumbing or pipefitting experience, and all but one indicated plumbing as a first choice. Although the Company did not perform a similar study for other years, the plaintiffs presented no evidence to indicate that placement practices were different in other years.

91. Disparities also appear in the placement of whites and blacks in learner occupations, even though no prior experience or skill is required for learners:

| | Whites | Blacks |
|---|---|---|
| Percent of Learners below labor grade 56 in 1966 | 58% | 71% |
| Percent of Learners below labor grade 56 in 1967 | 52% | 64% |
| Percent of Learners below labor grade 55 in 1968 | 48% | 63% |
| Percent of Learners below labor grade 54 in 1969 | 80% | 100% |

92. Boeing Vertol analyzed its 1967 learner program for Sheetmetal Assemblers B. 201 whites and 73 blacks participated in the program. The analysis showed that 51 percent of the blacks and 40 percent of the whites completed the program, and that both whites and blacks who completed the program spent an average of 189 days in the program before being promoted.

93. Plaintiffs presented statistical evidence concerning the labor grade distribution of whites and blacks in P & M jobs in various years:

| | Median White Labor Grade | Median Black Labor Grade |
|---|---|---|
| 1965 | 7 | 5 |
| 1967 | 7 | 5 |
| 1969 | 7 | 5 |
| 1971 | 8 | 7 |
| 1974 | 8 | 6 |

In each of the five years studied there was a statistically significant disparity adverse to blacks in terms of distribution by labor grade.

94. The same disparity adverse to blacks still existed when seniority was held constant in studies of the P & M workforce at the end of 1968 and 1973. In these studies the P & M employees were divided into 16 groups for 1968 and 26 groups for 1973, with each group of employees having approximately the same seniority date. For every group in 1968 and nearly every group in 1973, whites had a higher average wage than blacks. For all P & M employees in 1968 the average wage for whites was $3.75 per hour, and for blacks, $3.52 per hour. In 1973, the average wage for whites was $4.90 per hour, and for blacks, $4.77 per hour.

95. The plaintiffs also presented evidence concerning the labor grade distribution in groups of occupations in 1968. In the census occupational category of "operatives," the median white was at labor grade 7, and the median black at labor grade 5. In the census occupational category "crafts," the median white was at labor grade 9, and the median black at labor grade 7. A further analysis of narrower occupational groupings within the operatives and crafts categories showed statistically significant disparities adverse to blacks in 4 of the 6 groups large enough to test.

96. The plaintiffs presented evidence comparing the average gross earnings of white and black P & M employees:

| | White | Black |
|---|---|---|
| 1968 | $8,354. | $7,751. |
| 1971 | $7,552. | $7,295. |
| 1973 | $11,802. | $11,408. |

These figures show statistically significant disparities adverse to blacks in gross earnings.

97. The plaintiffs also presented evidence concerning the labor grade distribution of non-P & M employees. At the end of 1967, blacks were in lower labor grades than whites in the general salary, management and exempt administrative and professional categories. The same statistically significant disparities, adverse to blacks, were present in 1973. An analysis of the general salary payroll in 1968, 1971, and 1974 showed that the median labor grade for blacks was one grade lower than the white median.

98. The Company presented two statistical studies of actual promotions of 50 blacks and 50 whites hired in 1962 and 1966 respectively, and still employed by the Company in 1969.[5] In both of these groups, whites initially were placed in higher labor grades than blacks. However, for both groups, blacks and whites showed the same average increases in labor grade as of 1969. This result was confirmed in other statistical studies.

99. Although the plaintiffs presented evidence showing disparities between blacks and whites in terms of average labor grades and wages, these disparities did not increase between 1968 and 1973. In fact, during that time period, the average hourly wage of black employees increased by $1.25 per hour while the average for white employees increased only by $1.15 per hour. Similarly, in the same time period, the average annual wage of black P & M employees increased by $3,657, while the average wage increase for white P & M employees was only $3,448.

100. The plaintiffs presented evidence concerning the racial composition of the leadmen. The evidence generally showed that fewer blacks were leadmen than would be expected on the basis of the number of blacks in P & M jobs.

| | Actual Black Leadmen | Expected Black Leadmen |
|---|---|---|
| 1965 | 22 | 26 |
| 1966 | 31 | 52 |
| 1967 | 40 | 65 |
| 1968 | 42 | 76 |
| 1969 | 38 | 66 |
| 1970 | 16 | 21 |
| 1971 | 13 | 16 |
| 1972 | 13 | 13 |
| 1973 | 16 | 20 |
| 1975 | 14 | 25 |

An analysis of the leadmen at the end of 1967 also showed that on average, whites had been with the Company for one year less than blacks at the time they were selected as leadmen.

101. The Company introduced a statistical study purporting to show that employees generally have six or more years of Company service when they are appointed as leadmen. This study is not entirely persuasive, however, because it was based on the difference between the employee's company service date and his most recent appointment to leadman, rather than his first appointment. Nevertheless, it may be appropriate to compare the percentage of black leadmen to the percentage of black employees having the necessary experience, rather than to the percentage of blacks in the entire workforce. This is especially true in view of the substantial increase in the numbers of black employees in the late 1960's. Company records show that in December, 1968, blacks constituted about eight percent of all P & M employees having five or more years of experience. The percentages of leadmen who were black in the period 1966–1969 was as follows:

| | Number of Leadmen | Percentage of Black Leadmen |
|---|---|---|
| 1966 | 487 | 6.36 |
| 1967 | 533 | 7.5 |
| 1968 | 564 | 7.45 |
| 1969 | 509 | 7.46 |

5. These groups were not identical to the groups analyzed by the plaintiff.

102. The plaintiffs presented evidence of the racial composition of the supervisory workforce. Based on the percentage of blacks in the entire workforce (from which many managers are chosen), this evidence indicated that far fewer blacks held managerial positions than would be expected:

| | Total Management | Black Managers | Expected Black Managers (Based on Black percentage of total workforce) |
|------|------------------|----------------|------------------------------------------------------------------------|
| 1962 | 787 | 11 (minority) | 31 |
| 1963 | 1013 | 4 (minority) | 42 |
| 1964 | 961 | 3 (minority) | 40 |
| 1965 | 930 | 2 | 44 |
| 1966 | 1083 | 2 | 73 |
| 1967 | 1147 | 9 | 87 |
| 1968 | 1237 | 12 | 105 |
| 1969 | 1119 | 10 | 86 |
| 1970 | 634 | 8 | 34 |
| 1971 | 559 | 8 | 27 |
| 1972 | 581 | 14 | 32 |
| 1973 | 696 | 23 | 48 |

103. The plaintiffs also presented evidence of the racial composition of P & M managers. In calculating an expected number of P & M managers, the plaintiffs assumed that the proportion of P & M managers to the total number of managers would be the same as the proportion of P & M employees to the total number of employees. The plaintiffs also assumed that all actual black managers were in P & M. The plaintiffs' calculations showed that far fewer blacks held management positions in the P & M unit than would be expected, based on the percentage of blacks in the P & M workforce:

| | Estimated Number of P & M Managers | Actual Black P & M Managers | Expected Black P & M Managers, (Based on Black Percentage of P & M Workforce) |
|------|------|------|------|
| 1965 | 491 | 2 | 35 |
| 1966 | 577 | 2 | 59 |
| 1967 | 609 | 9 | 73 |
| 1968 | 646 | 12 | 85 |
| 1969 | 568 | 10 | 68 |
| 1970 | 310 | 8 | 26 |
| 1971 | 263 | 8 | 20 |
| 1972 | 254 | 14 | 21 |
| 1973 | 326 | 23 | 32 |

104. Although the number of black managers has been fewer than expected when compared with the number of blacks in the workforce, the disparity may be somewhat exaggerated by the increases in black employees in the late 1960's. An employee ordinarily is not promoted to supervision until he has been with the Company a few years. Consequently, the percentage

of black managers should be compared to the percentage of blacks with the necessary experience, which generally is lower than the percentage of blacks in the workforce. For example, at the end of 1968, about eight percent of employees having five or more years with the Company were black. Using plaintiffs' figure of 568 P & M managers in 1969, imposing a requirement of five years experience for managers would reduce the expected number of black managers from 68 to 45.

105. The percentage of black managers at Boeing Vertol has been rising steadily since 1967. The percentage of supervisory appointments offered and accepted by black employees has exceeded their representation in the workforce since 1967. From the beginning of 1967 through the summer of 1968, blacks constituted 19 percent of the appointments to P & M supervision. In P & M, blacks have constituted 16 percent of all supervisory selections since 1967. For all management positions, blacks accounted for nearly twenty percent of the increase in managers between 1970 and 1974.

106. In its affirmative action reports to the federal government, the Company has admitted a continuing underutilization of blacks in management positions.

IX. Job Family Structure

107. An employee's initial assignment to a particular job family can have an important effect on his earning possibilities at Boeing Vertol, since there are various restrictions which make it difficult to change families. For example, most openings are filled from the lower job classifications within the same family, and no employees outside the job family are considered unless they previously have filed promotion or transfer requests.

108. Plaintiffs' expert, Dr. DeCani, ranked Boeing Vertol's job families for various years in order of the average wage earned by all employees in each family, and in order of the highest occupied labor grade in each family. The plaintiffs' evidence showed that blacks tended to be in lower ranking job families than whites. On the other hand, blacks are represented in all job families, and black representation generally is increasing in most areas.

109. The job family system originally was established during collective bargaining between Piasecki and the Union in 1956. Many of the job classifications and job families have not changed since 1956. The purpose of the job family system is to provide a mechanism for handling frequent fluctuations in the size of the workforce. Employees in lower rated jobs learn skills which help them move up to higher rated jobs in the same family when employment increases. Likewise, during a reduction in force, employees in the higher rated jobs can bump down to other jobs in the job family, since the lower rated jobs require less skill. While the job classifications in most job families are related to each other, in at least two small families there is an insufficient skill relationship among job classifications to permit employees to bump down from higher graded jobs. In addition, some job classifications are functionally related to classifications in other job families.

110. Quality control jobs are in separate families from manufacturing jobs in order to preserve the importance and independence of quality control. However, experience in manufacturing frequently is a qualification for a related quality control job. Despite the separation of manufacturing and quality control, there are no unusual limitations on transfers between the two seniority units. The evidence indicated that blacks are underutilized in quality control jobs, and the Company's president identified quality control as an area that has been all white. The following table com-

pares the black participation in manufacturing and quality control units:

| | Black Percentage of Manufacturing Seniority Unit | Black Percentage of Inspection Seniority Unit |
|---|---|---|
| 1966 | 11.84 | 3.23 |
| 1970 | 9.72 | 2.99 |
| 1973 | 8.72 | 2.56 |

The Company attributed the low representation of blacks in quality control to skill and seniority requirements. Since openings in quality control have been filled primarily through promotions and transfers from manufacturing, the fact that a large percentage of the most experienced employees are white has limited opportunities for blacks to get quality control positions.

111. Boeing Vertol examined its job family structure in detail in 1968. The Company's primary conclusion was that the job family structure should be changed by consolidating jobs into less than half as many families. Another conclusion was that the promotion and transfer system should be changed to allow consideration of a broader group of employees, and to allow employees to bid for jobs on the basis of their qualifications and experience. Such a system, according to the study, would help management by permitting selection of better qualified employees.

112. As a result of the Company's study, a formal proposal was made to change the existing job family structure by reducing the number of families. The proposal also called for a bidding system to fill job openings. The Union similarly proposed substantial changes in the job family system to increase employee mobility, including a reduction in the number of families and posting of job openings. A second Company study in 1971 also recommended substantial changes in the job family system. These proposals were not implemented, and the job family system remained essentially unchanged.

X. Statistical Evidence—Reductions in Force and Disciplinary Actions

113. Boeing Vertol was forced to layoff a great many employees in 1969, 1970, and 1971. The plaintiffs presented statistical evidence showing that a disproportionate number of those layed off were black. For example, the following table compares the actual number of black layoffs in the P & M unit with the number expected, based on the percentage of blacks in the P & M unit:

| | Actual Black P & M Layoffs | Expected Black P & M Layoffs (Based on Black Percentage of P & M Workforce) |
|---|---|---|
| 1969 | 261 | 178 |
| 1970 | 443 | 341 |
| 1971 | 144 | 130 |

Stated another way, the statistics for 1971 showed that 22.3 percent of black employees but only 10.7 percent of white employees were laid off. Similarly, in 1970, the total workforce declined 43 percent, while the number of minority employees was reduced by 60.2 percent. These disparities were due to the fact that although the Company's hiring of minorities increased in the late 1960's, these employees did not have sufficient seniority to stay on the payroll when employment declined.

114. Boeing Vertol presented evidence concerning the effects on blacks of the large reductions in 1969 through 1972. According to the Company, fewer blacks were laid off under the job family system than would have been laid off under a straight plantwide seniority system in 1969, 1970 and 1972. In fact, blacks tended to be concentrated in the job families which were least affected by reductions in force.

115. The Company has introduced certain procedures in order to mitigate the effects of reductions in force on black employees. For example, it created a special committee in engineering to provide individual review of every layoff affecting a black engineer. This program enabled the

Company to increase slightly its utilization of black engineers between 1970 and 1971, despite a significant decline in total engineering employment.

116. The plaintiffs presented statistical evidence to show that reprisals and disciplinary actions were applied disproportionately to blacks:

| | Black Percentage in P & M Unit | Percentage of Reprimands to Black Employees | Percentage of Disciplines to Black Employees | Percentage of Severe Disciplines to Black Employees |
|---|---|---|---|---|
| 1966 | 11.2 | 18.4 | 17.5 | 18.3 |
| 1967 | 12.9 | 22.9 | 25.5 | 26.1 |
| 1968 | 14.2 | 25.6 | 33.7 | 33.9 |
| 1969 | 13 | 28.6 | 29.8 | 30 |
| 1970 | 9.1 | 17.8 | 19.1 | 19.1 |
| 1971 | 8 | 18.3 | 22.4 | 33.4 |
| 1972 | 8.8 | 8.6 | 0 | 0 |
| 1973 | 10.3 | 11.3 | 25 | 25 |

This data shows a statistically significant disparity adverse to blacks in every year from 1966 to 1971. After 1971, when this action was filed, the pattern of disproportionate discipline of blacks vanishes.

117. The Company has contended that disciplinary actions are related to the inexperience of the employee, and therefore disciplinary actions against blacks should be compared to the percentage of black new hires which always exceeded the percentage of blacks in the workforce between 1966 and 1971.

| | Percentage of New Hires in P & M who were Black | Percentage of Reprimands to Blacks | Percentage of Disciplines to Blacks |
|---|---|---|---|
| 1966 | 14.9 | 18.4 | 17.5 |
| 1967 | 20.2 | 22.9 | 25.9 |
| 1968 | 26.6 | 25.6 | 33.7 |
| 1969 | 20.4 | 28.6 | 29.8 |
| 1970 | 9.1 | 17.8 | 19.1 |
| 1971 | 31.2 | 18.3 | 22.4 |

118. Blacks have also suffered harassment in the form of racial epithets by white supervisors. However, the Company presented evidence in the form of inter-office memoranda showing a corporate policy against harassment of minority employees

by supervisors or other employees. Supervisors have been disciplined for using improper language to employees. The Company also has required supervisors to attend sensitivity training programs to make them more aware of the problems of black employees.

## XI. Individual Plaintiffs

### A. Mamie Croker

119. Mamie Croker is a black woman who left school in 1955 before completing the eleventh grade. She then had various jobs, but did not find a long-term position. Croker applied for work at Boeing Vertol in 1960 or 1961, but her application was rejected. She also was not hired by the Company after applying in the summer of 1963. From 1964 to 1966, Croker was unemployed. She again applied to Boeing Vertol in January, 1966, and filed another application in March of that year. At that time she was interviewed by a black employee in the personnel office, and told that she might qualify for work as an electrical bench assembler. Although her application reflects that this was her job choice, Croker testified that she did not specify a job choice, but someone else filled in Electrical Bench Assembly. Croker was hired in March, 1966, as a learner in electrical bench assembly, and except for layoffs, she has been employed by Boeing Vertol since that time. Before working at Boeing Vertol, Croker had no work experience or other qualifications which would have qualified her to be hired in any capacity other than as a learner who would be trained.

120. Although the Company hired at least three whites as learners for electrical bench assembly, in 1962 and 1963, it also hired three blacks as Electrical Bench Assembler B's in 1962. The Company did hire at least three whites as Electrical Bench Assemblers in 1963 and 1964. The Company's records show that at the end of 1968, 27 of the 30 persons employed as electrical bench assembler had been hired since 1961, when Ms. Croker first applied, and only one of the thirty was black.

121. Croker was promoted from learner to Electrical Bench Assembler B within three months. Croker performed Electrical Bench Assembler A work at times when such work was needed or available, and she was paid for such work at the rate of an Electrical Bench Assembler A. However, Croker was never promoted to an A classification despite having filed a request.

122. In one instance in 1968, the Company placed a white Electrical Bench Assembler B with less seniority and work experience than Croker in a position that was to be reclassified as an A rate job.

123. In April 1969, Croker at her own request transferred from Bench Assembler to a position with the same labor grade in a different job family, Electronics Equipment Assembler. Croker was laid off in October of 1970 during a general reduction in force. She was recalled in September 1973 as a utility man in the labor pool (Labor Grade 1). Although she filed several requests for promotions, she remained at Labor Grade 1 until January, 1974, when she was laid off again. In April of 1974, she was recalled again to a position at labor grade one. In terms of layoffs and recalls, Croker's employment history is typical for a Boeing Vertol employee, and reflects the changes in the Company's production schedules. Of course, if Croker had been hired earlier and had accumulated more seniority, she might have avoided being laid off.

124. In May of 1974, Croker was told by a supervisor that there were five openings for Dispatchers B, and that she was fourth on the promotion review list. After Croker indicated that she was still interested in the Dispatcher B position, the number of openings suddenly was reduced to three. Croker filed a complaint with the Union, and the Company subsequently reinstated the number of openings to five, and promoted Croker.

125. Croker testified about various instances of harassment at Boeing Vertol.

(a) In 1966, a white employee showed a black female employee a Ku Klux Klan

card, and said that she would be dealt with if she got out of line.

(b) In October of 1966, Ms. Croker requested a transfer to the day shift. Transfers were granted to several other employees, including some who had begun work at the same time as Croker, but her request was denied. After a grievance was filed and it was determined that Croker had worked at the Company for six months, she was transferred to the day shift.

(c) Croker testified that one of her supervisors, Frank Corvaglia, refused to help her find misplaced tools, timed her when she went to the ladies' room, and sometimes stood directly over her while she worked, although he did not act this way with white employees. Corvaglia denied giving any special attention to Croker, but he did not comment about many of the incidents Croker had mentioned. Moreover, Croker's testimony was corroborated by Edward Wellcock, a white employee who was Croker's shop steward in 1968.

(d) In another incident, Croker, another black female employee, and four white female employees were reprimanded for wearing tight pants. After this incident, the black employees' work stations were shifted to a position closer to the supervisors, while the white employees were not moved. Croker testified that she and the other black employees then were subjected to derogatory comments concerning the tightness of their clothes.

(e) In June, 1968, a union official asked Croker to obtain the names of employees who intended to participate in a "Poor People's March" in Washington, D. C., because the union was providing busses. Corvaglia refused to give Croker permission to obtain the names, and when Croker asked him to reconsider, he told her to leave him alone. Croker herself was told that she could get an excused absence in order to attend the march. The day before the march, however, several white supervisors told Croker that she would not be granted an excused absence, and might be fired if she went to the march. The matter was finally straightened out, and Croker went to the march and did get an excused absence.

(f) In July of 1968, Croker was discharged for failing to return to work at the end of her authorized medical leave. Croker had been to see the company doctor, who had said that her medical leave would be extended until she was released by her own doctor. Apparently this was not done, and as a consequence, Croker lost two days pay, which she has never recovered despite filing a grievance.

(g) Croker testified that on one occasion she was told by a white supervisor to leave the work area and go to the nurse, even though she felt fine and had no reason to see the nurse. On another occasion she was told to leave the floor by a supervisor because she was wearing a dress. At that time Croker was on medical leave, and was on the floor looking for a ride. While females in skirts were not told to leave.

(h) When Croker ran for shop steward, a supervisor told employees not to vote for her because she was a troublemaker, although the supervisor had never campaigned against another candidate.

(i) In 1971, while Ms. Croker was on layoff and was in Detroit on vacation, a reinstatement notice was sent to her home. Since an employee must report within 3 days or lose seniority rights, Croker was forced to return to Philadelphia. She then was told that there was no opening for her and she would not be recalled.

(j) Croker testified that on some occasions she was subjected to racially demeaning language, such as the terms "nigger" or "black bitch," and that on one occasion she was told by a white supervisor to accept the fact that she was black and had certain limitations. Supervisors also sometimes yelled at her loudly, although they did not yell at white employees.

126. When Croker transferred to Electronics Equipment Assembler in 1969, her new supervisor was Greg Torre. On her first day in the new position, Croker handed Torre a medical leave of absence slip, and

was gone for 60 days.[6] Mr. Torre testified that when Croker returned, she was given the usual introduction to the shop. Although Torre concedes that she learned the job quickly, he testified that he had trouble with her spending excessive amounts of time away from her work station. Eventually he gave her and several other employees an official reprimand for this reason. According to Torre, Croker was away from her work station between two and three hours a day, while the average employee spent only 17 minutes a day in non-productive time.

127. Croker claims that Torre told her at the outset that he was aware of her reputation. She testified that he timed her visits to the ladies' room while not timing whites, that white supervisors arbitrarily stared at her, and that she was suspended improperly for staring back.

128. Croker's shop steward during 1968 was a white employee, Edward Wellock. Wellock wrote a report on Croker after investigating several of her complaints. He concluded that she had been singled out for unprecedented action by the Company, and had been discriminated against because of race, personal reasons, and union activity. Wellock noted that company or union hearings did not help Croker, and that a white supervisor refused to discuss her problems with Wellock, as required by the bargaining agreement. In his testimony, Wellock stated that Croker did not make frivolous claims, but was one of the few employees with the nerve to speak out when treated improperly.

B. Leolin Dockins

129. Leolin Dockins is a black who has been employed by Boeing Vertol since June, 1966. Dockins had a diploma in industrial electronics, and had previous experience in electronic maintenance in the Army and through operating his own radio and TV repair shop. Immediately prior to applying for work at Boeing Vertol, Dockins attended a Manpower Development Training Program taught by Boeing Vertol employees. This program was designed to teach maintenance of numerical control equipment that was becoming widely used at that time. About six blacks and 15 whites participated in the program. Dockins was advised by his instructors to apply to Boeing Vertol, and he was hired as an Electronics Maintenance Learner. Six white persons in the same training program were hired before they completed the program, although none of the blacks or the remaining nine whites were hired early. According to Dockins the six whites hired before him did not have as extensive electronics experience, although there was no showing by the plaintiffs that Dockins was in the top one-third of the class. Dockins was hired about two months later, and at that time there were no other blacks in the entire job family.

130. Although Dockins made several requests, he was not promoted from learner to Maintenance Electronics B until May 11, 1967 (with a retroactive date to March 20, 1967), after his learner progression period had terminated. Dockins had performed the duties of a B man while he was a learner. In fact, when a B man for whom Dockins had substituted was transferred, he recommended Dockins as his replacement. However, Dockins was not offered the B job. Instead, the Company hired a white as a new employee and placed him as a maintenance electronics B man, even though he had no prior electronics experience. During the time that Dockins was a learner, there were openings in the B classification, since eight white employees were hired or reclassified into B positions during that time.

131. Boeing Vertol provides paid-time training for some of its employees. Most of the white employees hired with Dockins for electronics maintenance were sent to schools which taught maintenance of specific pieces of numerical control equipment used by Boeing Vertol. Dockins and another white employee were sent to a Leeds and

---

6. While working at Boeing Vertol, Croker has had several medical leaves of absence, and she never had any trouble obtaining a leave.

Northrop school to learn how to repair recorders. Dockins was not sent to the school attended by the whites until he had been with the Company for about 15 months. There are no written standards governing the selection of employees for training, and selections are made subjectively by supervisors. Dockins has received 584 hours of formal instructions on various kinds of equipment, in addition to courses outside the Company.

132. When Dockins became the most senior B man, he requested a promotion to an A classification, but was told that there were no more openings. The six whites who had been hired from the training school just before Dockins had already been promoted to the A classification, because their seniority dates were earlier. After Dockins was told there were no openings in the A classification, the Company nevertheless hired a white person named Edward Bailey as an Electronics Maintenance Man A. Bailey had worked for Boeing Vertol previously, but he had no rights to re-employment, and should not have been hired ahead of Dockins under the collective bargaining agreement. Dockins filed a charge of racial discrimination with the EEOC on June 19, 1968. About 2 weeks later he was told that there was an opening for an A job, but that the supervisor wanted to promote a white with less seniority. The supervisor asked Dockins to turn down the position in favor of the other employee, since there was only one opening. Dockins refused to do this, and said that he wanted the position. Subsequently, both Dockins and the white employee were promoted to the A classification on July 15, 1968.

133. Dockins has never been made a leadman or a supervisor, although at least 5 whites were made leadmen, and at least one white was made a supervisor. Bailey, who had less seniority than Dockins, was made a leadman.

134. Dockins' ability is demonstrated by the fact that the Company kept him on the Management Exempt List for five years, which protected him from layoff regardless of his seniority. His ability also is shown by his satisfactory performance after being promoted. Currently, Dockins is classified as a Maintenance Electronics A, at Labor Grade 12, and he has held this position since July, 1968.

135. In 1970 Dockins' supervisor announced that maintenance electronics men would be transferred temporarily to other locations for training on other equipment. Dockins was the first one transferred, and his supervisor refused to advise him when he could return to his old job. Under the collective bargaining agreement, Dockins' transfer would become permanent if a determination was not made within 60 days that the transfer was temporary. A permanent transfer might have endangered Dockins' status on the exempt list, since he was on that list because he had worked on certain machines in his old job. Dockins testified that while he was on transfer, Bailey, who had less seniority, took over Dockins' old job, and thus was certain to retain his place on the exempt list. However, Dockins also stated that he had to return several times to his old location to repair equipment that Bailey couldn't fix. Dockins finally complained to the EEOC about his transfer, and shortly thereafter he returned to his former job. Only one other employee in Dockins' department was ever transferred for cross-training. The Company contends that the transfer and training provided to Dockins was a special effort to insulate him from a reduction in force by increasing his value to the Company.

136. Dockins testified that as the first black in his department, he was subjected to derogatory comments as he worked in various parts of the plant. Supervisors repeatedly asked him if he knew what he was doing, if he needed any help, of if someone else was available to do the work. Dockins also heard white supervisors refer to black employees as "niggers."

### C. Chivis Davis

137. Chivis Davis is a black who was first hired as an aircraft electrician C by

Piasecki Aircraft Corporation, Boeing Vertol's predecessor in 1952. Davis was promoted to a Electrician Assembler A within two years, and in 1958 became a leadman. Following a layoff, he returned to the Company at an A rate, and then became leadman again. Davis was offered a supervisory position on several occasions between 1960 and 1962, and he became a supervisor in the electrical department in 1962, and subsequently supervised employees performing sheetmetal, mechanical and electrical work. In December of 1963, Davis was one of a number of supervisors who were returned to the ranks of the bargaining unit in a reduction in force following a reorganization of the supervisory positions. In July of 1964, Davis was reduced from leadman as a result of a further reduction in force. Since July, 1964, Davis has never been offered a position as leadman or supervisor.

138. At the time Davis was demoted, 19 other supervisors, all of whom were white, also were demoted. None of these employees has ever returned to a supervisory position, although some have been leadman.

139. Although the Company claims that Davis was demoted because he was unable to meet the responsibilities of a supervisor, there is no evidence that Davis was demoted for any reason other than a reduction in force. Davis has received many positive evaluations of his performance, and there was no evidence of negative evaluations. Of course, while there was no evidence that Davis was unqualified to be a supervisor, there also was no clear evidence showing that Davis could perform the duties of a supervisor capably.

140. Davis testified that at the time he was reduced from his supervisor position, there were other white supervisors with less seniority who were not reduced. Company records show that of 1013 total supervisors at that time, only four were nonwhite. Moreover, since 1964 many employees have been promoted into the leadman or supervisory positions previously held by Davis, and according to Davis, several of these employees, all of whom were white, had less seniority than he had. One white employee who had been a leadman under Davis eventually became his supervisor.

141. Since 1964 when Davis was reduced from his position as leadman electrician A, several white employees have been made leadmen. Similarly, several white employees have moved from final assembly electrician jobs into supervisory positions. Only one black employee was promoted to the supervisory position since Davis' reduction in 1963.

142. In December, 1965, there were 185 supervisors in the position that had been held by Davis, and all of them were white.

143. Although the Company's usual policy in filling supervisory positions is to promote persons who were downgraded due to a reduction in force, Davis was never promoted back, despite the fact that he had been downgraded for a reduction in force and vacancies existed.

144. Davis has heard white supervisors in his presence refer to black employees as "niggers." Davis' supervisors on occasion repeatedly asked whether a job had been completed, when the job was such that it could not have been completed for several days. According to Davis, white employees were not subjected to this treatment as frequently as blacks.

145. In 1967 and 1968, while Davis was a member of the Black Committee for Progress, he received numerous employee reports. In his prior 15 years with the Company, Davis had never received an employee report, and he has not received an employee report since 1969.

D. Eric P. Travis

146. Eric P. Travis is a black high school graduate who was hired as a Sheet Metal Assembler Learner in August, 1965. In the beginning of 1966, Travis was promoted to Sheet Metal Assembler B.

147. In his first few months with the Company, Travis inquired about the possibility of being transferred to the blade shop

or becoming a supervisor. His foreman, William Sweeney, told him that transfer to the blade shop was impossible because transfers were based on seniority and favoritism. Sweeney also told Travis that he believed that there were no black supervisors because of a Company rule. Another supervisor told Travis that his chances of becoming a supervisor were limited because he was black and because he was a learner. When Travis made a similar inquiry of a supervisor named John Baker, Baker replied "Don't bother me, boy. I don't have the time." John Baker used the term "nigger" to refer to black employees and often expressed his intolerance of them. Finally, sometime in 1968, Travis wrote a letter to the Office of Labor Relations requesting information about the criteria for becoming a supervisor, but he apparently received no response. Travis wanted to be promoted because he thought he had been in one grade long enough, and the work had become boring. However, the plaintiffs did not show that Travis was qualified to be a supervisor.

148. Although Vertol offered a voluntary half-shift training program for employees who wanted to become supervisors, Travis never took the course. Travis claims that he signed up for the course, but was never told where to report. He never followed up on his application.

149. There was some racial tension at Boeing Vertol in 1968. At that time, Travis was the Chairman of the Committee for Progress, and helped draw up a petition that was signed by many black employees. The petition protested harassment, name-calling, unfair hiring and firing policies, the lack of advancement for blacks, and bigotry and prejudice on the part of foremen and supervisors. The Committee also suggested that the Company control management and improve the corporate image, and requested that the Company promptly promote 200 black employees as supervisors. With this request, the Committee submitted a list of blacks who volunteered to be supervisors, but Travis did not put his own name on the list.

150. In June of 1968, Travis filed charges of racial discrimination with the Equal Employment Opportunity Commission.

151. On July 2, 1968, Travis received an employee report following a conversation with his supervisor, Vince Salvatore. Salvatore apparently told Travis to keep his talking to a minimum, and, according to Travis, said that Travis wasn't worth a damn. Travis responded by saying that Salvatore wasn't worth a damn as a supervisor, and Salvatore then fired him. Travis was not actually fired, but received a one-day disciplinary layoff.

152. On July 24, 1968, Travis received another employee report. This report was issued for improperly stamping work as complete which had not been accomplished. Travis had stamped several jobs by mistake, and after discovering his own error, had reported the mistake to Vince Salvatore, his supervisor. When Jack Proctor, Travis' general foreman, learned of the incident, he decided to give Travis an employee report, despite the protests of Salvatore that this was unfair. Salvatore subsequently lost his job as supervisor because of this incident. Later, at an informal meeting arranged by Travis' Union committeeman, Proctor agreed to void the employee report. However, this was never done formally.

153. Travis testified that he was harassed by frequent and unnecessary transfers in the course of a working day which sometimes resulted in employee reports against him for not accomplishing anything. He also stated that he had been cited for about 12 employee reports that do not appear in the official records because they were not properly processed.

154. Several of Travis' supervisors, such as Jack Proctor and John Baker, used the term "niggers" to refer to black employees. Proctor also on at least one occasion refused to approve promptly the promotion of a black learner before the expiration of his automatic progression period, although he immediately approved a similar promotion for a white employee. The evidence

showed that Proctor treated many employees badly, and used disparaging language to refer to members of other nationalities, not only blacks.

155. On March 26, 1969, Travis received an employee report for absences and tardiness. Travis testified that he had provided doctors' excuses for these absences, but they had been lost by the Company.

156. On January 28, 1970, Travis received an employee report from Proctor for not wearing safety glasses. Safety glasses were required only after work commenced, and Travis claimed that the employee report was based on a failure to wear safety glasses that occurred before his starting time. On the employee report itself the time of observation appears to have been altered to read 7:28 a. m., and it previously could have been 6:28 a. m. as claimed by Travis.

157. Travis' employee reports from 1967 through 1970 were not purged from his file as called for by the collective bargaining agreement.

158. In 1968 or 1969 Travis and a friend submitted a proposal to the Company concerning its minority problems, and suggesting that the Company attempt to improve communications with minorities and sensitize its management to the problems of black employees and black business. This document indicates Travis' broad concern with social problems and the evils of industry in general, as well as his hope that industry could help solve these problems.

E. Robert W. DeBose

159. Robert W. DeBose, a black, was hired by the Company in July, 1967, as a Sheetmetal Assembler B. Before being hired by Boeing, DeBose had had electrical and electronics training in the United States Navy and at a technical school, and he had worked in electronics and as a sheet metal assembler. He was hired after meeting a Company recruiter, who told him to apply for a job as a sheet metal assembler, despite his greater interest in electronics. Approximately three months after being hired, DeBose was promoted to Sheetmetal Assembler A.

160. In June, 1966, DeBose filed a lateral transfer request for the position of Inspector Fuselage Assembly. DeBose wanted to transfer because he felt there was more opportunity for advancement from a quality control job. DeBose was familiar with the duties of Inspector Fuselage Assembly, and was qualified to perform those duties. Moreover, at the end of 1966, only one black had a position as Inspector Fuselage Assembly, and there were very few blacks in the job family to which DeBose wished to transfer.

161. DeBose's transfer request was never granted, although there were vacancies in the position that were filled by white employees, some of whom had less seniority than DeBose. Company records show that the movements into the position were by persons who were promoted from Inspector Fuselage Assembly Learner positions or persons who had formerly been inspectors in Fuselage Assembly and were bumping down. No lateral transfers to the position were granted during the time DeBose's request was on file, even though 12 white persons with more seniority than DeBose had filed such requests.

162. DeBose was made a leadman in 1968. In 1969, other white leadmen in DeBose's department were asked if they would take supervisory positions, but DeBose was not asked. DeBose had more seniority than some of the whites who became supervisors. The only explanation given by the Company for not offering a supervisory position to DeBose was his supervisor's subjective opinion that DeBose was not outgoing enough and would not have made a good supervisor. The evidence indicated that DeBose may never have been considered for a supervisory position. Of course, there is no evidence that DeBose ever asked for such a position.

163. DeBose's personnel file contains many comments characterizing him as a good worker. In fact, DeBose has received various awards from the Company under its Zero Defects program.

164. During his employment at Boeing Vertol, DeBose received only one employee report or reprimand. In 1969, he and some 300 other persons received 95-day disciplinary layoffs for falsifying expense account documents in order to claim extra money from the Company.

### F. Rudolph Richardson

165. Rudolph Richardson, a black, was hired as a Helper in 1953 by Piasecki, a predecessor to Boeing Vertol. By 1962, Richardson was a Sheetmetal Assembler A, a position he has continued to hold.

166. In 1967 and 1969, Richardson filed requests for a lateral transfer to Inspector Fuselage Assembly. Richardson was never granted such a transfer, even though he was qualified for the inspection position, and also had taken a blueprint reading course. At the time Richardson filed his requests, many other employees, both black and white, unsuccessfully requested transfer to Inspector Fuselage Assembly. However, some white employees were reclassified to Inspector Fuselage Assembly. Company records show that these employees either were being demoted from leadman status or being promoted from a lower classification. The Collective Bargaining Agreement provided that persons seeking promotion be considered before persons seeking lateral transfer. At the time Richardson was trying to transfer, there was a much higher proportion of blacks in the Assembler Sheetmetal A job than in the inspector job.

167. In February, 1973, Richardson requested a promotion to Developmental Mechanic A. Although Richardson was qualified for such a position, he was never offered a promotion. Company records show that 19 employees were reclassified into the Developmental Mechanic A job in early 1973 after Richardson's request, and that approximately 17 of these were whites with less seniority than Richardson. However, Richardson himself testified that these employees probably had been reclassified from Developmental Mechanic B to Developmental Mechanic A, which was the normal progression required under the Collective Bargaining Agreement and given priority over a promotion from another job family.

### G. Dudley Sykes

168. Dudley Sykes applied for employment at Boeing Vertol in 1966. At that time he had a B.S. degree in Civil Engineering and had experience as an engineer with the Army Corps of Engineers and with the firm of United Engineers.

169. Sykes had answered an advertisement for a project engineering position by sending in a copy of his resume. The Company then expressed interest in Sykes, and an interview was arranged at the Boeing Vertol plant. Although the interview process was not well coordinated, Sykes did meet with several individuals to discuss possible employment.

170. Sykes was not hired by Boeing Vertol. Although Sykes believed he was qualified for the project engineering job, he had never had such a job at the time of the interview. Sykes subsequently has worked as a project engineer on jobs involving building construction.

171. At the end of 1966, Company records show that of the 774 employees in engineering, only 5 were black. Of the 376 persons hired in 1966 for professional or technical jobs, only 4 were black.

### H. William J. Craig

172. William Craig, a black, was first employed by Boeing Vertol in August, 1967, as a Clerk A. Prior to working for Boeing Vertol, Craig had extensive clerical experience in the federal government, and had attended college for a time.

173. Craig first sought employment with Boeing Vertol in the summer of 1965. He was offered a position as a clerk-typist (grade level 2) which he turned down as unsatisfactory. Craig was qualified for a position as a Clerk A at this time. Over the next two years, Craig made frequent telephone calls to Mae St. Germaine, the person

responsible for Technical and Office hiring, but was unable to obtain a position. Ms. St. Germaine did interview, hire, or approve the hiring of other blacks for clerical positions. In July, 1967, Craig went to see Ms. St. Germaine, but was told there were no openings. However, through the intervention of Paul Taylor, a black friend, Craig was first offered a position as a Shop Clerk, and actually commenced employment as a Clerk A.

174. At the end of 1965, none of the 61 persons in the Clerk A position was black. At the end of 1966, only 1 of the 61 persons in the Clerk A position was black. Between August, 1965 and February 1967, 13 white persons were hired into Clerk A positions. Ms. St. Germaine did approve the hiring of several blacks for office and technical positions during this time, however.

175. On his 1967 application for employment, Craig indicated a first choice of administrative assistant, and it appears that he was qualified for such work. At the end of 1967, all 28 persons in this position were white.

176. Craig had an excellent record at Boeing Vertol. After threatening to resign on several occasions when he felt he was not getting enough responsibility, he was transferred from Clerk A to Training Coordinator and eventually was promoted to Supervisor of Personnel Records, a management position. Craig left Boeing Vertol in 1975 because of a reduction in force.

177. Black employees and blacks seeking employment frequently approached Craig for advice during the time he worked at Boeing Vertol. Craig often consulted with other Company personnel in order to resolve these problems. At trial, Craig testified concerning several black persons who either were not hired or were hired at a level below their qualifications.

I. Donald Ferrell

178. Donald Ferrell, a black, was hired as a Sheetmetal Assembler B in 1961. He had been employed previously by Boeing Vertol, but he had lost his recall rights and was hired as a new employee. Ferrell was promoted to A status in a year, and a year later was made a leadman in Sheetmetal Assembly. He continued as a leadman until a reduction in force in 1969. Presently he is a Sheetmetal Assembler A.

179. Ferrell completed an advanced blueprint reading course, and his work record reflects awards in the Company's Zero Defects Program, as well as several certificates of merit and other positive evaluations.

180. From 1963 and afterwards, Ferrell expressed interest in being made a supervisor, but never received any encouragement. Ferrell was qualified to be a supervisor in areas involving sheetmetal work. At this time there were no black supervisors over sheetmetal personnel. Although numerous whites were promoted to such positions, virtually no blacks were promoted before 1968, and relatively few after that time.

181. In early 1969, Ferrell served as a leadman under Thomas Smilowski, who is white. Ferrell testified that Smilowski had ordered him to perform certain work personally that was normally done by another employee at the direction of a leadman. The reason for this order may have been that another employee had offered to bet Smilowski that he couldn't get Ferrell to perform the work, although Smilowski denies making any bets. At any rate, the next day Ferrell was transferred to another unit, run by Claude Greenleaf, a black supervisor. Essentially, Ferrell switched positions with a white employee, Bill Cialacki. The Company's explanation of this exchange was that Cialacki had a bad hip and was transferred to Ferrell's job because it involved more bench work. Ferrell testified, however, that both jobs involved similar work duties. Smilowski testified that the exchange was instigated by Greenleaf, and that Smilowski tried to keep Ferrell because he was a good leadman.

J. Horace Dixon

182. Horace Dixon, a black, was hired by Boeing Vertol as a Milling Machine Op-

erator Learner in February, 1966. Prior to that time Dixon had completed the 11th grade in high school and an 18-month training course on machine operations. He also had had some employment experience with machines.

183. Dixon had applied for employment at Boeing Vertol in August 1965 after seeing an advertisement that the Company was hiring various machine operators. However, Dixon was told that the Company was not hiring. Several months later, Dixon again visited Boeing Vertol, but was still told that the Company wasn't hiring. However, Company records show that a number of individuals, nearly all of whom were white, were hired as Milling Machine Operator Learners in late 1965, after Dixon had applied but before he was hired. Moreover, some individuals, most of whom were white, were hired directly into positions as Milling Machine Operator B's. Dixon was qualified to be a Milling Machine Operator B at the time of his initial application and the time of his hire.

184. Several months after commencing employment at Boeing Vertol, Dixon was made a Drill Press Operator B because production requirements necessitated more men in that department. In October, 1966, he became a Drill Press Operator A. Dixon wanted to return to Milling Machine Operator, and filed a request for a transfer. This request was finally granted in September, 1967, after Dixon filed a grievance.

185. In 1967 or 1968, Dixon filed a request for a promotion to Machinist B. At the end of 1967, there were 37 employees in this classification, all but one of whom were white. Similarly, the machinist job family had only 6 nonwhite employees out of a total of 197. After Dixon filed a grievance to obtain action on his request, the request was granted in October, 1968. During 1968, but before Dixon was promoted, the Company hired several white persons from outside the Company as Machinist B's.

186. In October, 1972, Dixon was promoted to Machinist A and placed on a different shift. After one month, he was de-moted back to the B classification on the basis of his foremen's evaluation that Dixon was unable to perform the job. Two white employees were similarly demoted at this time. Dixon testified that he was qualified to perform A work, but that his work was hindered by the extra pressure placed on blacks to be outstanding. Dixon also testified that after being moved back to a B classification, he noticed white employees with less seniority were being promoted to Machinist A. Company records show that several whites with less seniority than Dixon were promoted to Machinist A during this time, and that two white persons were hired as new employees for the same position. Of course, several whites with more seniority than Dixon remained as Machinist B's at this time.

187. The Machinist A classification was almost exclusively white: at the end of 1970, it covered 31 employees, all of whom were white; in early 1973, it covered 64 employees, all of whom were white.

188. In August, 1973, Dixon was again promoted to the A rate, and performed satisfactorily until bumped back down to Machinist B during a reduction in force.

K. Edward Claiborne

189. Edward Claiborne, a black, was hired in 1954 as a Milling Machine Operator B by Piasecki, Boeing Vertol's predecessor. Claiborne had prior experience as a milling machine operator at the Frankford Arsenal. After filing a grievance, he was promoted to Milling Machine Operator A in 1960 or 1961, and in 1965, at his own request and after filing another grievance, he was sent to Numerical Control School.

190. By 1966, Claiborne was a Milling Machine Operator A, the highest rated job in his job family. At that time, a new position of Set-up Developer Milling Machine Operator was created, which was rated higher than Milling Machine Operator A. Claiborne received no notice of the creation of this new position, but discovered several months later that certain other employees had been promoted, although they contin-

ued to perform essentially the same work as before. Company records show that eight employees, one of whom was black, were reclassified into the new position in September or October 1966.

191. Claiborne was qualified to be a Set-up Developer Milling Machine Operator in 1966. He was promoted to that job in 1974.

L. John F. Edwards

192. John Edwards, a black, was hired by Piasecki in 1952. He has worked in the Transportation Department of Boeing Vertol since that time, and at the time of trial, was a bus driver. Edwards has an excellent work record at Boeing Vertol. He has received zero defects awards, and has made numerous suggestions which have been adopted to improve the Company's operations.

193. No black employee ever served as a supervisor in Transportation until 1974, despite the fact that a substantial number of black employees worked in that department. Between 1963 and 1968, eight white employees were made supervisors in Transportation.

194. Edwards completed and passed a pre-supervisory course offered by the Company. He was qualified to be a supervisor in Transportation. However, he never was approached by the Company concerning such a position. Edwards had never requested a supervisory position, at least in part because there was no procedure for making such requests.

195. At trial, Edwards never testified that he would have accepted a position as supervisor. What he wanted was an opportunity to accept or reject the job. In fact, in the course of his employment Edwards has been offered other assignments, including the job of Dispatcher, but he has turned down these offers.

M. William Banks, Sr.

196. William Banks, a black, was hired by Boeing Vertol as a janitor in October, 1962. Banks had graduated from Bok Vocational Technical High School in 1958, and before working at Boeing Vertol, he had worked as a kitchen helper, a porter, a clerk, and a janitor. He also had worked part-time as a carpenter during the four years after his graduation.

197. Banks sought employment as a carpenter's helper, but was hired as a janitor. At least one white person was hired as a maintenance carpenter in 1962, although the position this person filled was not created until after Banks had been hired. Company records show that from 1965 through 1970, there were only one or two blacks in the entire woodworking family. In 1971, there were no blacks in the woodworking family. Many whites were hired into woodworking jobs, or reclassified into such jobs after 1962.

198. Banks testified that in late 1962 or early 1963 he filed a request for promotion to a woodworking job, but that he apparently was rejected as unqualified even though no one asked him about the job or tested his abilities. Banks also testified that he tried on other occasions to move to a woodworking job, but never was successful.

199. Although promotion requests ordinarily are maintained in employees files, Banks' personnel file does not contain any requests for promotion or transfer to Maintenance Carpenter B or Tool Woodmaker B dated before 1969. Moreover, Banks never resorted to the established grievance procedures as a means of obtaining a transfer to the woodworking department.

200. Banks also complained of the absence of black supervisors in the Transportation Department, where he has worked since 1963. In 1968 he requested that he or another black be appointed as supervisor, although at the time there were both black and white employees in Transportation who had greater seniority. From 1969 until 1974, no new supervisors were appointed in Transportation. Thereafter, the only such appointment in 1974 went to a black employee, and one of the two supervisory positions offered in 1975 was offered to a black employee.

## N. Stanley L. Gladstone, Jr.

201. Stanley Gladstone, a black, was hired in 1951 as a Sheet Metal Man C by Piasecki. Before 1951, Gladstone had attended the Hampton Institute, and received technical training in the Army Air Force.

202. Gladstone testified that he unsuccessfully applied for employment at Piasecki on several occasions between 1946 and 1951. Gladstone is very fair-skinned, and he attributed the rejection of his earlier applications to the disclosure of his race on the application. The application from which he was hired in 1951 contained no indication of the applicant's race.

203. Gladstone himself described his progress after being hired as "fairly rapid." By 1953, he had become a Jig and Fixture Builder A, at labor grade 11. Gladstone testified that in the early 1950's he heard that he was being considered for a supervisory position. However, shortly afterwards a supervisor questioned him about his race. Gladstone never was offered a supervisory position during the 1950's despite making several inquiries about a position in planning or as a foreman.

204. In 1960 or 1961, Gladstone asked for the assistance of the local branch of the NAACP, and soon after, he was made a Tool and Methods Planner, and later a Service Training specialist. Gladstone was unable to perform as an instructor, and so was moved to Training Devices, where he worked on equipment and did not have classroom duties. Gladstone was rapidly promoted in this department, and was very proficient in shop practices, fabrication, and design of training devices.

205. In 1966, the training department was beginning to use new media concepts as part of its programs. The Company hired Ed Marshall, a white with credentials in the area of vocational training, to introduce these new programs. Marshall was fired after several months for not performing his job competently. Gladstone felt that he should have been chosen for the supervisory position instead of Marshall. However, Gladstone was not familiar with modern training techniques other than those previously used at Boeing Vertol. Dennis Ladd, who worked with Gladstone, testified that after a meeting to discuss his advancement Gladstone himself acknowledged that he was not being held back. Gladstone testified that Ladd once questioned his loyalty to the Company because of his resort to the NAACP in 1960.

206. In 1969, there was a reduction in force. Through an Affirmative Action Program, Gladstone was placed in Quality Assurance rather than being laid off. After further reductions in force, Gladstone was bumped to Jig and Fixture Builder. In 1973, he was promoted to Supervisor, where he remained until March, 1975. At that time he was bumped back to a P & M position, although a number of white persons continued as supervisors. Gladstone had suffered a stroke in late 1974. Although he testified that the stroke did not impair his ability to be a supervisor, there was no other evidence to show that he was still qualified. The Company claimed that the white supervisors who were retained had been supervisors longer than Gladstone, although it did not offer evidence concerning the superiority of these individuals.

## DISCUSSION

This employment discrimination case was presented through both statistical evidence and the testimony of individual class members. In the foregoing Findings of Fact, I have summarized the illustrative individual testimony, and presented portions of the statistical evidence. Although a great wealth of statistical information was presented at trial, I have included in this opinion only the statistical evidence particularly relied on by one side or the other. This factual information should be sufficient to show the basis of the parties' claims and defenses, and it will be analyzed more fully in this section of the opinion.

### § 1985(3) Claim

Several preliminary matters must be resolved before the merits of the case can be

**1178**

considered. Plaintiffs' complaint alleges that the Company violated the Civil Rights Acts of 1866 and 1871 (42 U.S.C. §§ 1981, 1985) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Shortly before trial commenced, the defendant filed a motion to dismiss claims based on § 1985. The Court reserved ruling on defendant's motion pending the completion of trial. Now that the trial has been completed, the defendant's motion will be granted.

■ The pertinent portion of § 1985 prohibits a conspiracy by two or more persons to deprive any person of the equal protection of the laws. In *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court set forth the elements which must be satisfied to state a claim under § 1985(3). The first element is that the defendants did "conspire or go in disguise on the highway or on the premises of another." The plaintiffs in this case have failed to satisfy their burden of proof on this element, since they have not established the existence of a conspiracy. Plaintiffs claimed that Boeing Vertol conspired with the Union to commit the various discriminatory acts complained of. Shortly before trial, however, the plaintiffs settled their case against the Union. Consequently, at trial the plaintiffs' evidence dealt almost exclusively with actions by the Company. The plaintiffs presented no direct evidence of any conspiracy or agreement between Boeing Vertol and the Union (or anyone else), and any circumstantial evidence was insufficient to support a finding of conspiracy. I therefore find as a matter of fact that the plaintiffs failed to prove the existence of a conspiracy, and consequently their claims under 42 U.S.C. § 1985(3) will be dismissed.

### STATUTE OF LIMITATIONS

A second, and much more difficult, preliminary matter involves the statute of limitations. On August 4, 1972, I certified this action as a class action on behalf of

". . . all Negro persons currently employed by the defendant Boeing Company, Vertol Division, and Negro persons employed by Boeing Company, Vertol Division between June 19, 1962 and the present, and all Negro persons who unsuccessfully sought employment with the Boeing Company, Vertol Division between June 6, 1967 and the present."

The defendant has moved to eliminate from this class those persons whose claims are barred by the statute of limitations. Different statutes of limitations apply to the plaintiffs' claims under Title VII and those under § 1981. For both statutes, however, the limitations issue raises difficult questions, some of which apparently have not been decided previously.

■ Title VII, as it existed when this action was filed, provided a 90 day limitation period for filing charges with the EEOC. Under Title VII, a plaintiff can bring a class action on behalf of persons who have not filed EEOC charges. Moreover, the filing of an EEOC charge tolls the statute of limitations for both the person who has filed the charge, and any class of persons he purports to represent. On the other hand, a plaintiff's filing with the EEOC does not revive stale claims for which the 90 day time period has already expired at the time the plaintiff filed his charges. In this action, the named plaintiffs can represent all persons who could have filed charges with the EEOC on June 19, 1968, the date plaintiff Croker filed her charge. See *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). All Title VII claims that did not accrue after March 23, 1968 (90 days prior to June 19, 1968) are barred by the statute of limitations.

■ The plaintiffs argue that the Title VII claims cannot be cut off as of March 23, 1968 because of the pendency at that time of other Title VII charges against Boeing Vertol which tolled the statute of limitations from November 6, 1966. This argument is based on the case of *Love v. Boeing Company (Vertol Division)*, C.A. No. 69–1151 (E.D.Pa.), a Title VII class action filed

in 1969 and later dismissed without class certification on May 13, 1971. There is no question that the filing of a class action raising the same issues as the present action would have tolled the statute of limitations for the purposes of this action. See *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

However, the plaintiffs are not relying on the class action as the tolling mechanism, since by the time the *Love* suit was filed in 1969, the Title VII claims of the present class members were already tolled by Croker's EEOC charges. Rather, the plaintiffs contend that the Title VII claims were tolled on February 4, 1967, when Love filed *his* charges with the EEOC. I have found no cases dealing with the tolling effect of EEOC charges filed prior to those of the representative plaintiffs. The plaintiffs' position seems logical, since it is inconsistent to rule that Love's EEOC charges tolled the statute of limitations for his class action, but did not toll the statute of limitations for other purposes. On the other hand, given the protracted nature of most EEOC proceedings, acceptance of the plaintiffs' position might have the practical effect of eliminating a statute of limitations under Title VII, at least for large corporations, since filing of discrimination charges by a different employee every few years would keep the statute tolled perpetually.

■ However, I need not resolve this difficult issue because the plaintiffs' tolling argument is defective on another ground. While the plaintiffs have submitted to the Court a copy of the complaint in the *Love* case, they have not provided the Court with a copy of Love's charges filed with the EEOC. Whether Love's administrative charges operated to toll other Title VII claims depends primarily on the nature of those charges. Just as the scope of a Title VII suit is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970), so the tolling effect of an EEOC charge must be limited. Although Love's court complaint contains some general allegations of employment discrimination, most of Love's claims concerned his non-promotion to a supervisory position. Love's administrative charges may have been limited to his non-promotion claim, or may have been even narrower. Without seeing Love's administrative charge, I am unable to determine whether those charges should serve as a basis for tolling the statute of limitations on the Title VII claims in this case. Therefore, the plaintiffs' argument must be rejected, and the cut off point for all Title VII claims will be March 23, 1968.

■ The application of the statute of limitations to the plaintiffs' § 1981 claims raises equally difficult problems. Since the Civil Rights Acts contain no statute of limitations, the most appropriate state statute of limitations ordinarily is applied. See *Johnson v. Railway Express Agency,* 421 U.S. 454, 462, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). I have ruled in another case that the most appropriate statute of limitations in Pennsylvania for employment discrimination claims is the six-year statute applicable to claims of interference with contractual relations. 12 P.S. § 31; see *Dupree v. Hertz Corp.,* 419 F.Supp. 764, 766–68 (E.D. Pa.1976). The Third Circuit's recent unhelpful discussion of this issue in *Wilson v. Sharon Steel Corp.,* 549 F.2d 276 (3d Cir. 1977, *as amended,* March 9, 1977), offers no reason for changing my analysis in *Dupree.* Since the complaint in this action was filed on September 2, 1971, the six-year statute of limitations bars § 1981 claims which did not accrue after September 2, 1965.

Again, however, the plaintiffs argue that the limitations period must be extended because the statute was tolled by the *Love* case. *Love* involved only claims based on Title VII. In *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Supreme Court held that filing Title VII charges with the EEOC does not toll the statute of limitations on § 1981 claims based on the same facts. This ruling was based on the Court's determina-

tion that Title VII and § 1981 provide separate, distinct and independent causes of action. Although the Court's precise holding in *Johnson* was limited to the tolling effect of filing Title VII charges with the EEOC, the reasoning of *Johnson*—that Title VII and § 1981 are separate and independent—is equally applicable to this case. Under *Johnson,* the Title VII claims raised in the *Love* case were entirely separate from the § 1981 claims brought by the plaintiffs here, and the *Love* case therefore would not have tolled the statute of limitations for the plaintiffs' § 1981 claims.

Recognizing the likelihood of this result under *Johnson,* the plaintiffs also have contended that the *Johnson* decision should not be applied retroactively. The Supreme Court has recently set forth the factors which must be considered in deciding whether a non-constitutional, non-criminal decision should be applied retroactively:

> "First, the decision to be applied non-retroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Finally, we have weighed the inequity imposed by retroactive application . . . .. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (citations omitted).

Several District Courts have applied these factors to the *Johnson* decision and concluded that *Johnson* should not be applied retroactively. See, e. g., *Woods v. Safeway Stores, Inc.,* 420 F.Supp. 35 (E.D.Va.1976); *Hambrick v. Royal Sonesta Hotel,* 403 F.Supp. 943 (E.D.La.1975); *Bush v. Wood Brothers Transfer,* 398 F.Supp. 1030 (S.D. Tex.1975). Other courts, without any discussion of the issue, have applied *Johnson* retroactively. See, e. g., *Dupree v. Hutch-*

*ins Brothers,* 521 F.2d 236 (5th Cir. 1975); *Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1, 17 (E.D.Pa.1975).

■ I believe that the Third Circuit is most likely to apply *Johnson* retroactively, and I will do so in this case. To begin with, in this Circuit, unlike the Fifth Circuit, the *Johnson* decision does not overrule a clear past precedent, since the Third Circuit has never considered the tolling effect of filing Title VII charges with the EEOC on the § 1981 statute of limitations. Secondly, it is not inequitable to apply *Johnson* retroactively, at least in this case. Because this Court has applied a six year statute of limitations to the plaintiffs' § 1981 claims, there is no danger that plaintiffs will lose § 1981 claims during the time their Title VII claims are before the EEOC. Even without tolling the statute of limitations for the § 1981 claims, the plaintiffs in this case will be able to reach much further back in time under § 1981 than under Title VII. There is no inequity in cutting off the plaintiffs' claims as of September 2, 1965, since before 1965, racial discrimination by employers was not illegal.

Moreover, as the plaintiffs point out, § 1981 was not recognized in this Circuit as creating a cause of action for employment discrimination until 1971. *Young v. International Telephone & Telegraph Co.,* 438 F.2d 757 (3d Cir. 1971). Therefore, it is not unreasonable to refuse to toll the statute of limitations on § 1981 claims for the time the *Love* suit was pending between 1969 and 1971. At that time, victims of employment discrimination would not have failed to file § 1981 claims in reliance on Love's Title VII suit, but simply because such claims had not yet been established in the Third Circuit. Since under all the circumstances, it is not inequitable to apply *Johnson* retroactively, the decision should be so applied. I hold that the six year statute of limitations applicable to § 1981 was not tolled by the case of *Love v. Boeing Company, supra,* and that all claims under § 1981 that did not accrue after September 2, 1965 are barred by the statute of limitations.

An additional matter that should be mentioned at this time is the status of evidence of discrimination prior to September 2, 1965. In one of their briefs, plaintiffs contend that discrimination prior to the limitations period is relevant because present practices, even if facially neutral, are unlawful if they perpetuate prior discrimination. Until the very recent case of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), this view was undoubtedly correct. See *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974). In *Teamsters*, however, the Supreme Court held that neutral, bona fide seniority systems which perpetuate prior discrimination are not unlawful. 431 U.S. at 353, 97 S.Ct. 1843. See also *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); discussion *infra*. These holdings greatly limit the relevance of prior discrimination, since any perpetuation of such discrimination occurs primarily through a seniority system. In this case, plaintiffs presented a substantial amount of evidence concerning events prior to the limitations period. Although this evidence is not of great probative value, I have considered it to some extent in deciding issues of racial motivation.

### § 1981 Liability

There is some question as to what elements the plaintiffs must prove in order to establish a violation of 42 U.S.C. § 1981. Prior to *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), courts normally applied the same standards to both § 1981 and Title VII. An employer practice which had discriminatory effects was unlawful under either or both statutes unless the employer established a "business necessity" defense. An intent to discriminate did not have to be proved. See *Boston Chapter, N.A.A.C.P. Inc. v. Beecher*, 504 F.2d 1017, 1021 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Carter v. Gallagher*, 452 F.2d 315, 323 (8th Cir. 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

In *Washington v. Davis, supra,* however, the Supreme Court held that proof of a discriminatory racial purpose was necessary to make out a constitutional violation in an employment discrimination case:

"Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." 426 U.S. at 242, 96 S.Ct. at 2049, 48 L.Ed.2d at 609 (citation omitted).

Although the Court did not hold explicitly that intentional discrimination is a necessary component of a claim under § 1981 (even though the plaintiffs in *Washington* had made a claim under that section), other courts have ruled, and I agree, that the constitutional standards must also be applied to § 1981. See *City of Milwaukee v. Saxbe*, 546 F.2d 693, 705 (7th Cir. 1976); *Johnson v. Hoffman*, 424 F.Supp. 490, 494 (E.D.Mo.1977). Section 1981 and the Thirteenth and Fourteenth Amendments to the Constitution originally were passed at about the same time to deal with the problems of blacks after the Civil War. The language of § 1981, that "all persons . . . [should] have the same right . . to the full and equal benefit of all laws" clearly is parallel to the equal protection clause of the Fourteenth Amendment which was construed by the Supreme Court in *Washington v. Davis.* Under the circumstances, I must conclude that the same standard for proving discrimination applies to § 1981 and the Constitution. See *Johnson v. Hoffman, supra.* Moreover, if this were not the case, the Supreme Court's decision in *Washington v. Davis* would be meaningless, since § 1981 is applicable in every case in which constitutional claims of employment discrimination are asserted. Therefore, I hold that in order to make out a claim under § 1981, the plaintiffs must prove a racially discriminatory purpose.

In *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50

L.Ed.2d 450 (1977), the Supreme Court enumerated some appropriate areas of inquiry for determining whether a racially discriminatory intent existed. The Court noted that disparate impact is an important starting point. If the disparity is dramatic and unexplainable on grounds other than race, then a discriminatory impact can be inferred from the disparity itself. In most situations, however, further inquiry into historical background, specific events and other indicia of intent is necessary.

■ In this case, the racial disparities established by the plaintiffs, at least those since 1965, are insufficiently dramatic or unexplainable to justify an inference of purposeful racial discrimination. Although the plaintiffs may have proven isolated instances of intentional racial discrimination, they have not proven that Boeing Vertol had a policy of intentional racial discrimination, nor have they shown a pattern or practice of purposefully discriminatory acts. See *International Brotherhood of Teamsters, supra,* 431 U.S. at 337, 97 S.Ct. *hood of Teamsters v. United States,* 431 failed to establish class-wide violations of § 1981, and those claims will be dismissed.

### Title VII—Burden of Proof

■ Allocating the burden of proof is a complex issue in employment discrimination cases. Initially, plaintiffs have the burden of making out a prima facie case of discrimination. See *International Brotherhood of Teamsters v. United States,* —— U.S. 324, at 336, 97 S.Ct. 1843, 52 L.Ed. 2d 396 (1977); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). To make out a prima facie case, the plaintiffs need only show that the employer's practices have a discriminatory impact—they need not prove purposeful racial discrimination. In fact, good intentions and the existence of affirmative action programs are not defense to a Title VII action. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Many cases have held that the plaintiffs' burden can be met with statistical evidence. See, e.g. *International Brotherhood of Teamsters, supra,* 431 U.S. at 339–341 & n. 20, 97 S.Ct. 1843; *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970). Unexplained statistical disparities, especially if gross and longlasting, permit an inference of racial discrimination. *International Brotherhood of Teamsters, supra.*

■ Once the plaintiff has presented a prima facie case of discrimination, the burden shifts to the defendant to rebut the inference of discrimination. The defendant may attempt to do this by demonstrating that the plaintiffs' statistical showing is inaccurate or insignificant. "Statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted." *International Brotherhood of Teamsters, supra,* 431 U.S. at 340, 97 S.Ct. at 1856. The defendant also may attempt to justify the statistical disparity by showing that the disparity is the result of a requirement which has a manifest relationship to the employment in question. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). If the defendant does meet this burden, then the plaintiffs are free to show that the challenged practice is merely a pretext for discrimination, because other alternatives exist which would accomplish the employer's legitimate purposes without creating racial effects. See *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The precise nature of the burden on the defendant after the plaintiffs have presented a prima facie case is a matter of some dispute. Some courts have held that the defendant only has the burden of going forward with evidence; the burden of persuasion remains with the plaintiffs. See *Causey v. Ford Motor Co.,* 516 F.2d 416 (5th Cir. 1975); *Bittar v. Air Canada,* 512 F.2d 582 (5th Cir. 1975). Other courts have held that once the plaintiffs have established a

prima facie case, the defendant has the burden of proving its justification or explanation of the disparate treatment by a preponderance of the evidence. See, e.g., *Ostapowicz v. Johnson,* 541 F.2d 394 (3d Cir. 1976); *United States v. Hayes International Corp.,* 456 F.2d 112, 120 (5th Cir. 1972). The Supreme Court recently clarified this issue in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 409, 50 L.Ed.2d 343, 355 n. 14 (1976). The Court noted that plaintiffs in Title VII cases "have the traditional civil litigation burden of establishing that the acts they complain of constituted discrimination in violation of Title VII." The burden on the employer to justify its practices does "not arise until discriminatory effect has been shown."

As I interpret this language, the plaintiffs retain at all times the burden of proving discrimination by a preponderance of the evidence. Even if the plaintiffs initially present a prima facie case of discrimination, if the defendant in its case introduces evidence that the plaintiffs' statistical comparisons are inaccurate or that any disparities have innocent explanations, then the prima facie case of discrimination must be reexamined. The plaintiffs can prevail only if they have proven the existence of discriminatory effects by a preponderance of all of the credible evidence. To show class-wide discrimination, the plaintiffs must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure— the regular rather than the unusual practice." *International Brotherhood of Teamsters, supra,* 431 U.S. at 336, 97 S.Ct. at 1855. On the other hand, if the plaintiffs have proved the existence of discrimination by a preponderance of the evidence, then the defendant has the burden of proving by a preponderance of the evidence that any requirements that it imposes which have

discriminatory effects are justified under the so-called "business necessity" standard.

In this case, the plaintiffs have presented both statistical evidence and evidence of individual acts of discrimination, although they relied primarily on statistical evidence. The plaintiffs also showed that opportunities for discrimination were present in most aspects of the Company's operations. The defendant's case generally was directed toward showing that the plaintiff's evidence did not establish racial discrimination. Keeping the foregoing analysis of the burden of proof in mind, I now will examine each area of alleged discrimination.

### Hiring

The plaintiffs have adopted several different approaches for showing hiring discrimination. First of all, the plaintiffs have compared the black percentage of the total employees at Boeing Vertol (never more than 8.4 percent) with the black percentage of the workforce in the Philadelphia SMSA (16.14 percent).[7] While the disparities developed by this comparison are impressive, they are not probative of discrimination in *hiring* during the time period at issue in this suit. See *Green v. McDonnell-Douglas Corp.,* 528 F.2d 1102, 11 E.P.D. ¶ 10,663 (8th Cir. 1976). If the low percentage of blacks in the workforce was due primarily to its racial composition before 1965, rather than hiring discrimination after that time, the employer would not be liable. See *International Brotherhood of Teamsters, supra,* 431 U.S. at 360–361, 97 S.Ct. 1843. Thus, actual hiring figures must be considered, rather than workforce utilization figures.

Comparing the racial composition of the persons actually hired and the available workforce in the Philadelphia SMSA effectively rebuts any inference of discrimi-

---

7. The Company has contended that labor force comparisons should be made with Delaware County (only 6.7 percent black) rather than with the Philadelphia SMSA. This contention must be rejected. Although the Company presented some evidence of transportation difficulties in getting to its plant from outside Delaware County, a substantial portion of its workforce does come from other counties. More importantly, the defendant's own statistical expert suggested that the Philadelphia SMSA was the most appropriate area for making labor force comparisons.

**1184**

nation in P & M hiring. Although a somewhat lower than statistically expected number of blacks were hired in 1965 and 1966, since that time the Company has consistently hired a higher percentage of blacks than the 16.14 percent available in the Philadelphia SMSA civilian workforce. (See Finding of Fact 63, supra).

■ The plaintiffs also have attempted to establish hiring discrimination by comparing the utilization of blacks in the Company's workforce with the estimates of minority availability made by the Company in its Affirmative Action Reports. These Reports show that minorities were underutilized in most occupational categories. Again, however, underutilization does not necessarily imply hiring discrimination. Actual hiring figures must be examined, and these show that the percentage of blacks hired exceeded the Company's estimates of minorities in the recruitment area. Even if the plaintiffs had established disparities between the Company's hiring patterns and the estimates of minority availability in the Affirmative Action Reports, these would not necessarily satisfy the plaintiffs' burden of proving discrimination. The Affirmative Action estimates are only estimates, and no evidence was introduced to establish their accuracy. They are designed to encourage employers to increase recruitment efforts. Using such estimates as a basis for imposing liability would discourage employers from setting hard-to-reach goals.

■ The plaintiffs next compare the racial composition of the persons hired to the racial composition of those who filed applications for employment with Boeing Vertol. The data shows that between 1968 and 1971, blacks filed between 31 and 37 percent of all applications, while only 24.4 percent of the persons hired were black.[8] Since the evidence shows that some persons (such as

8. The plaintiffs' efforts to show discrimination before 1968 on the basis of application data extrapolated from the post 1968 data must fail. There was no actual data on the racial composition of pre-1968 applications, and any extrapolation backwards from 1968 is speculative.

plaintiff Mamie Croker) sometimes filed more than one application, the application data may not be a reliable measure for proving racial discrimination. See Robinson v. Union Carbide Corp., 538 F.2d 652, 658 (5th Cir. 1976). Moreover, no evidence was presented concerning the qualifications of any of the applicants. While the application flow data initially permits an inference of discriminatory hiring, this inference does not stand up in light of all of the evidence. (See discussion, infra).

The most significant evidence introduced by the defendant on the hiring issues was a Manpower Utilization analysis prepared by Dr. Seymour Wolfbein. In this analysis, Dr. Wolfbein calculated the availability of blacks for particular occupations on the basis of census figures showing the percentage of blacks among those employed in that occupation. He then compared the expected utilization of blacks with the Company's actual utilization. (See Findings of Fact 70–73, supra). The plaintiffs have pointed out several deficiencies in Dr. Wolfbein's analysis. For example, unemployed persons were excluded, females were excluded in many categories, and the study did not take into account the presence of overlapping skills in various census categories. All of these factors, if included, would have tended to show higher availability figures for blacks in many occupations. Nevertheless, despite these deficiencies, the Manpower Utilization analysis is convincing evidence that black availability in many job categories is lower than the black percentage of the general workforce, and this fact must be considered in evaluating the plaintiffs' evidence. See, e.g., Coopersmith v. Roudebush, 170 U.S.App.D.C. 374, 517 F.2d 818, 823 (1975), Hester v. Southern Railway Company, 497 F.2d 1374, 1379 (5th Cir. 1974), McAdory v. Scientific Research Instruments, Inc., 355 F.Supp. 468, 475 (D.Md. 1973).

Even if such projections were possible, the application data would not establish intentional discrimination under 42 U.S.C. § 1981, and any Title VII claims would be barred by the statute of limitations.

■ The plaintiffs contend that the Manpower Utilization analysis must be disregarded because it is built upon the unproven assumption that Boeing Vertol needs to require prior experience before hiring employees in various job classifications. Although there might be some merit to the plaintiffs' contention if they were attacking a particular experience requirement for a particular type of job, general experience requirements generally have been invalidated only where prior discrimination prevented blacks from obtaining experience. See, *Rowe v. General Motors Corp.,* 457 F.2d 348, 358 (5th Cir. 1972); *Crockett v. Green,* 388 F.Supp. 912, 918 (E.D.Wis.1975), aff'd, 534 F.2d 715 (7th Cir. 1976). In fact, general experience requirements have been upheld by the courts. See *United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 443–48 (5th Cir. 1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). *Waters v. Furnco Const. Corp.,* 9 E.P.D. ¶ 9968 (N.D.Ill.1975). Certainly, the employer is permitted to rebut any inference of discrimination in a statistical comparison by showing that the comparison has not taken into account appropriate qualifications.

In this case, the evidence shows that most employees hired, except learners, possess experience relevant to the position they obtain. Whether or not the particular experience requirements for a particular job are a "business necessity," certain kinds of experience obviously are necessary. To cite two simple examples, a secretary hired for a typing position must be able to type, and an electrical engineer must be able to do electrical engineering work. The evidence has established that a large proportion of the jobs at Boeing Vertol require various skills, and the Manpower Utilization analysis, although not precise, shows that fewer blacks possess these skills.

In *International Brotherhood of Teamsters, supra,* the Supreme Court stressed that statistical evidence is not irrefutable, and specifically noted that "evidence showing that the figures for the general popula-

tion might not accurately reflect the pool of qualified job applicants would also be relevant." *Id.,* 431 U.S. at 340 n. 20, 97 S.Ct. at 1857. Dr. Wolfbein's Manpower Utilization analysis is such evidence, and it is relevant.

■ Although the plaintiffs attack the validity of the Wolfbein study, they also use it to demonstrate an underutilization of blacks in certain subcategories of jobs, such as clerical and professionals. Again, the plaintiffs' comparison does not prove hiring discrimination because the utilization analysis shows only a static picture. Underutilization may be caused by the fact that blacks were underutilized by the Company in the early 1960's and before, rather than by discrimination in hiring after 1968. Moreover, Title VII does not require that an employer's workforce be racially balanced in all areas. Underutilization in some categories and overutilization in others is to be expected, and does not necessarily demonstrate discrimination. Cf. *Swint v. Pullman-Standard,* 539 F.2d 77, 94–95 (5th Cir. 1976).

■ Finally, in order to avoid the defendant's argument that fewer blacks are qualified for jobs at Boeing Vertol, the plaintiffs have analyzed the Company's hiring in its learner program, where the Company has conceded that it did not impose any experience requirements. The evidence shows very great disparities in 1963 and 1964, but claims of hiring discrimination in those years are barred by the statute of limitations. While fairly substantial disparities existed in 1965 and 1966, these are not sufficiently large to prove intentional discrimination under § 1981, especially without any application data for those years. Any Title VII claims for those years are barred by the statute of limitations. After 1967, the percentage of learners who were black exceeded the percentage of blacks in the Philadelphia SMSA labor force. (See Finding of Fact 78, *supra* ). This demonstrates nondiscrimination in the Company's learner programs after 1967. See *Green v. McDon-*

*nell Douglas Corp.*, 528 F.2d 1102, 11 E.P.D. ¶ 10,633 (8th Cir. 1976).[9]

On the basis of all of the evidence in the case, I find that the plaintiffs have failed to prove discrimination in hiring by Boeing Vertol within the relevant time periods. Although the plaintiffs have shown that there were opportunities for discrimination in the Company's hiring process, they have not established purposeful hiring discrimination after 1965, nor have they shown racial disparities in hiring after 1968 which justify an inference of discrimination under Title VII.

Although plaintiffs did present some evidence of hiring disparities adverse to blacks, especially using application data, statistical evidence must be examined critically and all the facts and circumstances must be considered. See *International Brotherhood of Teamsters, supra; Hester v. Southern Railway Co.*, 497 F.2d 1374 (5th Cir. 1974); *Logan v. General Fireproofing Co.*, 521 F.2d 881 (4th Cir. 1971). Statistical comparisons must be between comparable groups, and "the use of statistics . . . must be conditioned on the 'absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn.'" *Swint v. Pullman-Standard*, 539 F.2d 77, 97 n. 50 (5th Cir. 1976).

In this case, the defendant's evidence has raised another variable—qualifications—which is a logical and legitimate explanation of any disparities that may exist. The plaintiffs presented no statistics which were correlated to the relevant labor market of qualified applicants. See *United States v. Jacksonville Terminal Co., supra; Lim v. Citizens Savings & Loan Assoc.*, 430 F.Supp. 802, 13 E.P.D. ¶ 11554 (N.D.Cal.1976). The general workforce statistics plaintiffs did

present do not show sufficiently great disparities to justify an inference of discrimination. Compare *United States v. International Union of Elevator Constructors*, 538 F.2d 1012, 1016 (3d Cir. 1976), and cases cited therein. Finally, the other evidence in the case did not support an inference of discrimination. This evidence showed that Boeing Vertol never engaged in an official policy of segregation, that blacks were hired for all areas of the Company's operations, that the percentage of blacks hired in P & M exceeded the percentage of blacks in the Philadelphia SMSA workforce, and that fewer blacks were available for positions in engineering, technical or other skilled jobs. Upon considering all of the evidence, I find that the plaintiffs have failed to prove any classwide discrimination by Boeing Vertol in hiring during the time periods covered by this action.

### Job Family System and Layoffs

The plaintiffs have challenged the Company's job family system as a continuing violation of Title VII because it unlawfully perpetuates the effects of prior discrimination. Similarly, they have alleged that the disparate effect of layoffs on black employees established discrimination, even though layoffs were made pursuant to the Company's seniority system.

Prior to the Supreme Court's decisions in *International Brotherhood of Teamsters, supra, and United Air Lines, Inc. v. Evans, supra,* the plaintiffs' attacks might have been successful. Numerous cases had held that a seniority system that "locked-in" victims of prior discrimination in undesirable jobs was itself unlawful. See, e.g. *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1373–74 (5th Cir. 1974); *United States*

---

**9.** Plaintiffs' rebuttal testimony of Dr. Rosenblum that the appropriate labor market for learner jobs was 24.7 percent black does not support a finding of discrimination in the learner program. Dr. Rosenblum's criteria for defining the relevant labor market (1–4 years of high school; between the ages of 20 and 34) are arbitrary, and probably inaccurate. For example, many persons hired as learners were not within the delineated age group. There also appear to be some inaccuracies in Dr. Rosenblum's method of determining from census data the racial composition of his arbitrarily defined labor market. Of course, even if Dr. Rosenblum's study is accepted at face value, it does not establish disparities in hiring for the learner program in 1968 or thereafter, and those are the only years for which Title VII claims are not barred by the statute of limitations.

v. *N.L. Industries, Inc.,* 479 F.2d 354 (8th Cir. 1973); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 658–59 (2d Cir. 1971). In this case, the plaintiffs presented evidence showing that the job family system created restrictions on transfer. Although it did not penalize employees who were able to transfer by taking away their seniority, the priority given to employees within the same job family in filling vacancies effectively operates to prevent transfers between families except to the lowest jobs in a family. Under the prior law, coupling these restrictions on transfer with a showing that black employees had been discriminatorily assigned to inferior job families at any time in the past would have established that the Company's seniority system unlawfully perpetuated the prior discrimination.

In *Teamsters, supra,* however, the Supreme Court held that a neutral and bona fide seniority system is not unlawful under Title VII even if it perpetuates prior discrimination, by virtue of § 703(h) of that Title, 42 U.S.C. § 2000e–2(h), which provides in part:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin."

The Court specifically noted that the statutory exception applied to all types of seniority systems:

> "In addition, there is no reason to suppose that Congress intended in 1964 to extend less protection to legitimate departmental seniority systems than to plant-wide systems. Then as now, seniority was measured in a number of ways, including length of time with the employer, in a particular plant, in a department, in a job, or in a line of progression. . . .

The legislative history contains no suggestion that any one system was preferred." *International Brotherhood of Teamsters, supra,* 431 U.S. at 348–355 n. 41, 97 S.Ct. at 1864. (citations omitted)

Finally, in *United Air Lines, Inc. v. Evans, supra,* the Court held that "the operation of a seniority system is not unlawful under Title VII even if it perpetuates post-Act discrimination that has not been the subject of a timely charge by the discriminatee." *International Brotherhood of Teamsters, supra,* 431 U.S. at 348 n. 30, 97 S.Ct. at 1860.

Reading *Evans* and *Teamsters* together establishes that a neutral and bona fide seniority system cannot be the basis of a Title VII violation. A person discriminated against in hiring or job placement must challenge the hiring or placement discrimination directly. If he proves such discrimination, he will be entitled to full relief, including his rightful place in the seniority system. See *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). He cannot, however, let the statute of limitations run and then file suit based on a "continuing violation" embodied in the seniority system, unless he can show that the seniority system is not facially neutral, or is a means of intentional racial discrimination.

In this case, the plaintiffs' evidence in no way establishes that Boeing Vertol's job family system is other than bona fide and facially neutral. Although Boeing Vertol failed to prove that the job family system was a business necessity, it did show that its system was designed to insure safety and efficiency in an industry marked by large fluctuations in the size of the workforce, and that such systems are used throughout the aerospace industry. The plaintiffs presented no evidence to show that creation of the job family system in 1956 was intended to preserve discriminatory patterns of employment. To the extent the restrictions of the job family system lock employees in undesirable jobs, the sys-

tem affects blacks and whites in such jobs equally. Consequently, the job family system is not itself unlawful under Title VII. See *International Brotherhood of Teamsters, supra,* 431 U.S. at 356, 97 S.Ct. 1843. Moreover, although other restrictive practices, such as limitations on the number of transfer requests, probably must be considered part of the seniority system, even if they are considered separately, they cannot be a basis for imposing liability. Such restrictions have not been shown to cause disparate impact, since, as plaintiffs have pointed out, the job family's hierarchial method of filling vacancies is the real cause of any lock-in effects.

■ Plaintiffs' claims based on discriminatory layoffs fail for the same reasons. Although the plaintiffs have established that layoffs in 1969, 1970 and 1971 disproportionately affected blacks, this disproportionate effect was due to the fact that the Company's hiring of minorities increased in the late 1960's. Thus, a higher proportion of blacks than whites had insufficient seniority to stay on the payroll. Since layoffs were made according to a neutral seniority system, however, under *Teamsters* the disproportionate effects cannot be the basis of a finding of liability. Similarly, although layoffs in non-P & M areas were not accomplished through a formal seniority system, any disparate effects are easily explained as the result of applying a "last-hired, first fired" principle. Certainly, there is no evidence that blacks were singled out for layoff over comparably situated whites. By analogy to *Teamsters,* such layoffs are not themselves violations of Title VII.

### Initial Placement and Promotion

Although plaintiffs cannot use the Company's job family system or layoff policy as a basis for liability, they are free to present evidence of any initial placement or promotion discrimination that occurred within the statute of limitations period. A showing of such discrimination would entitle the plaintiffs to full relief, which might include changes in or adjustments to the job family

system. See *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

To prove initial placement discrimination plaintiffs introduced a significant amount of statistical evidence tending to show that blacks were at lower labor grades than whites. For example a study of initial placement of P & M employees in 1967 revealed that the median white labor grade was one higher than the median labor grade for blacks. Plaintiffs' 50/50 studies showed similar disparities, and a study of the placement of learners showed that a disproportionate number of blacks were placed in lower labor grades. Plaintiffs' statistical expert ranked the Company's job families according to the average wage earned within the family and the highest occupied labor grade in the family, and the evidence showed that blacks tended to be placed in the lower ranking job families. However, plaintiffs' rankings were somewhat arbitrary, since jobs appearing in more than one family (representing about 40 percent of total P & M employment) were assigned to only one job family. Plaintiffs also repeatedly emphasized the low number of blacks in the Inspection seniority unit. However, plaintiffs presented no evidence of discriminatory selections for Quality Control where qualified blacks were passed over in favor of less qualified whites. The evidence showed that most positions in Quality Control were filled through promotions and transfers according to the seniority system. Consequently, the low percentage of blacks in Quality Control is caused to large extent by the prior racial composition of the Company's workforce, and cannot be a basis for liability under the doctrine of *International Brotherhood of Teamsters, supra.*

To prove general promotion discrimination, the plaintiffs introduced evidence showing consistent year end labor grade disparities of one or two grades adverse to blacks, and data showing that average hourly wages were higher for whites than blacks in 1968 and 1973. Disparities appeared within occupational groupings and

with seniority held constant. For non-P & M employees, median labor grades for blacks were one grade lower than for whites in every year studied.

To rebut this evidence, Boeing Vertol presented an analysis of employees hired in 1971 which showed that most new employees were initially placed at jobs corresponding to their job choice. Of course, plaintiffs correctly point out that some general job choices cover several different job classifications at different labor grades, so that choice alone would not explain placement disparities. In addition, testimony established that at least some applicants were advised by interviewers to specify certain job choices, so a correlation between "job choice" and placement would be expected. Nevertheless, the Company's study does raise another logical explanation for some disparities in placement.

The Company also showed that between 1968 and 1973 average wages increased more for blacks than for whites. In 1968 the average hourly wage for blacks was 93.9 percent of the average for whites; by 1973, this had increased to 97.3 percent. Two statistical studies of 50 whites and 50 blacks hired at about the same time showed the same average labor grade increases for blacks and whites, although blacks had initially been placed lower. The evidence also showed that both black and white learners spent the same amount of time in the learner program.

■ I have considered carefully all of this evidence, and again I find that the plaintiffs failed to prove racial discrimination in placement or promotions. A large part of the plaintiffs' evidence concerned activities before March 23, 1968. Since this evidence did not establish intentional discrimination under § 1981, all such evidence is irrelevant. Another part of the plaintiffs' evidence consisted of labor grade distributions of the labor force at the end of various years. Such evidence is not probative of placement or promotion discrimination after March, 1968, for the same reasons mentioned in discussing the hiring issue.

Disparities which existed before that date and merely continued to exist are not actionable in this suit. Plaintiffs must prove actual discrimination in placement or promotion after March, 1968. Finally, evidence showing that whites and blacks have been promoted at the same rates, and that the differential between white and black wages narrowed significantly between 1968 and 1973 effectively rebuts any inference of discrimination in promotions since 1968.

The only remaining probative evidence is statistics showing disparities in initial placement after 1968. There is very little such evidence, and the disparities it reveals are not very great. As the Company's study for 1971 demonstrates, these disparities can be explained to great extent by the applicant's job preference, or by differing qualifications. Moreover, in light of all of the other evidence showing non-discrimination in hiring and promotions, there is insufficient evidence for inferring a practice or policy of discrimination.

In *International Brotherhood of Teamsters, supra,* the Supreme Court stated that statistical evidence must be considered carefully, together with all the circumstances of the particular case. (See discussion, *supra*). The Court also discussed the effect of a finding of class-wide discrimination:

"The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The [plaintiffs] need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proven discrimination. As in *Franks,* the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." *International Brotherhood of Teamsters, supra,* 431 U.S. at 362, 97 S.Ct. at 1868. (citation omitted).

In this case, the plaintiffs have presented insufficient proof of discrimination in place-

ment or promotion to justify a presumption that a practice or policy of discrimination was in force. While some individual placement or promotion decisions may have been made for unlawful, discriminatory reasons, there is insufficient evidence to shift the burden of justifying each and every decision to the employer. It is noteworthy that the plaintiffs have cited no case, nor have I found any, in which equally small disparities in labor grades or average wages were made the basis of a finding of discrimination in placement or promotions. In fact, at least one court has refused to find discrimination despite much more convincing evidence than has been presented in this case. See *James v. Stockham Valves and Fittings Co.*, 394 F.Supp. 434 (N.D.Ala. 1975).

### Promotion—Leadmen and Supervisors

The plaintiffs presented statistical evidence showing significant disparities between the percentage of blacks in leadman and supervisory positions, and the percentage of blacks in the workforce and in P & M jobs. (See generally Findings of Fact 100–105, *supra*). Although these disparities are impressive, the defendants have identified some procedural problems in plaintiffs' method of estimating the total number of P & M managers and an expected number of black managers. In addition, the defendant has stressed that the pool of experienced employees was predominately white. Since hiring of blacks increased greatly in the mid-1960's, the percentage of blacks in the workforce (on which the plaintiffs based their calculations) always exceeded the percentage of blacks among experienced employees. While Boeing Vertol failed to establish that any particular amount of experience was necessary before an employee could be appointed to a leadman or supervisory position,[10] it was clear from the evidence that most leadmen and supervisors had at least several years experience when appointed. Certainly, experienced employees are the most likely candidates for leadman and supervisory positions, and experience must be considered in evaluating the plaintiffs' statistical disparities. Because of the patterns of hiring at Boeing Vertol, comparing the number of black leadmen and supervisors to the percentage of blacks among experienced workers reduces or eliminates any disparities. For example, between 1967 and 1969 the percentage of leadmen who were black was very nearly equal to the percentage of blacks among employees with five years experience. (See Finding of Fact 101, *supra*).

■ Most importantly to an evaluation of the Company's promotion practices, Boeing Vertol produced evidence showing that since 1967 the percentage of blacks selected as supervisors has exceeded the percentage of blacks in the workforce (from which supervisory selections are made). Although the Company's evidence on this point was not particularly strong, it was never rebutted by the plaintiffs, who have the burden of proving discrimination. Evidence of the racial composition of the persons actually promoted is the most direct evidence of discrimination in promotion within the statute of limitations period. See *Swint v. Pullman-Standard*, 539 F.2d 77, 104 (5th Cir. 1976). In this case, the defendant's evidence effectively rebuts any possible inference of discrimination in promotions.

Such an inference is also rebutted by the recent history of employment at Boeing Vertol. Between 1968 and 1971 or 1972, there was a drastic reduction in the number of leadmen and supervisors, as well as the total number of employees. Instead of new supervisors and leadmen being appointed, less senior ones were demoted. Under these circumstances, it is understandable that the percentage of leadmen and supervisors who were black would not increase very much, even if new appointments were given to blacks in proportion to their representation in the workforce. In fact, given the racial composition of the Company's

---

**10.** The job description requirement that leadmen have five years experience in the particular occupation evidently was not strictly enforced, since some employees were appointed as leadmen without such experience.

management employees in the mid-1960's (which reflected the racial composition of the workforce in earlier years), and the lack of seniority of many black leadmen and supervisors in those positions, it appears that blacks have fared fairly well in retaining leadmen and supervisory positions, and in gaining more of these positions since 1971.

As I have emphasized earlier in this opinion, statistical disparities must be examined carefully to determine if they justify an inference of racial discrimination. After examining all of the evidence concerning promotions to leadman and supervisory positions, I conclude that Boeing Vertol has not engaged in purposeful racial discrimination in such promotions since September, 1965, and its promotion policy has not violated Title VII since March, 1968.

### Discipline and Harassment

The plaintiffs introduced statistical evidence that blacks received a disproportionate number of reprimands and disciplinary actions in comparison to their representation in the workforce. (See Finding of Fact 116, *supra*). Plaintiffs also presented testimony of individual instances of harassment, some of which will be discussed in more detail later in this opinion. To rebut plaintiffs' statistical evidence, Boeing Vertol contended that inexperienced employees are involved in many more disciplinary actions than other employees. The Company produced a statistical comparison showing that the percentage of reprimands and disciplines given to blacks was roughly comparable to the percentage of new hires who were black. (See Finding of Fact 117, *supra*). However, the Company did not produce any statistical evidence which actually proved the assumption underlying its comparison—i. e. that new employees have more disciplinary problems than other employees.

I am not entirely sure how to evaluate the plaintiffs' claims of discriminatory discipline and harassment. It is clear that Title VII requires that discipline be imposed equally against whites and blacks for the same behavior. See *United States v. Lee Way Motor Freight, Inc.*, 7 E.P.D. ¶ 9066 (D.Okl.1973). The EEOC has held that an employer must take reasonable steps to maintain an atmosphere free of racial intimidation and insults. See *EEOC Decision No. 74–25, CCH EEOC DECISIONS* ¶ 6400 (September 10, 1973). On the other hand, in order to show class-wide discrimination, the plaintiffs must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. [They have] to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure— the regular rather than the unusual practice." *International Brotherhood of Teamsters, supra*, 431 U.S. at 336, 97 S.Ct. at 1855.

The plaintiffs in this case have failed to meet this burden. While they have shown some individual acts of harassment, they have not established any consistent pattern. Most of the testimony concerning harassment was vague as to the time and place and persons involved, and much of it concerned events that occurred before March, 1968, and so would not be cognizable under Title VII. It may be significant that nearly all of the cases cited by the plaintiffs in support of their harassment claims were individual actions, where a pattern or practice did not have to be proved. Moreover, an employer cannot be liable for the unauthorized acts of its employees, even if those employees are front line supervisors. See *United States v. United States Steel Corp.*, 371 F.Supp. 1045, 1054 (N.D. Ala.1973), *modified on other grounds*, 520 F.2d 1043 (5th Cir. 1975). Liability can only be premised on the employer's failure to take reasonable steps to prevent racial harassment of which its upper level management is aware. No pattern or practice of such failures was proved in this case. As for plaintiffs' claim of discriminatory discipline, plaintiffs did not rebut defendant's statistical evidence correlating discipline of blacks with the number of blacks newly hired, and inexperience is as reasonable an

explanation of the disparities as is race. In addition, plaintiffs did not prove that any individual disciplinary actions against black employees were unjustified, or that white employees who violated Company rules did not get disciplined.

I hold that the plaintiffs have failed to prove that Boeing Vertol engaged in a pattern or practice of racially discriminatory harassment or discipline. Plaintiffs' evidence was insufficient to shift the burden of proof to the defendant to justify every disciplinary action against a black employee. See *International Brotherhood of Teamsters, supra,* 431 U.S. at· 359–361, 97 S.Ct. 1843.

### Conclusion—Class Issues

Although I have concluded that the plaintiffs have failed to prove any class-wide discrimination within the relevant time periods, I must emphasize as strongly as possible that this was not an easy case.[11] The Fifth Circuit's recent comments on the difficulties of Title VII litigation are well worth repeating:

> "If there ever was a time of facile Title VII litigation, it surely ended with the demise of intentional violations of equal employment opportunity. Today's parade of Title VII cases present more and more subtle manifestations of discrimination. Proof of invidious practices becomes more difficult as the ability to separate the real violation from the unfounded suspicion grows harder. This is especially so since many employers and unions . . . have made substantial good faith efforts toward eliminating racial distinctions for the workforce." *Swint v. Pullman-Standard,* 539 F.2d 77, 99 (5th Cir. 1976).

11. I note that plaintiffs' case has been greatly affected by recent Supreme Court cases which have drastically changed the law in the area of employment discrimination. *See International Brotherhood of Teamsters,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.E.2d 396 (1977) (use of statistics, pattern and practice, lock-in); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (intent); *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct.

This case involved an employer, Boeing Vertol, that clearly has made substantial efforts to eliminate racial discrimination. I recognize that at least to some extent Boeing Vertol's efforts to eliminate discrimination were only undertaken in response to EEOC complaints and court suits filed by individuals such as the plaintiffs in this case. Nevertheless, I have found that the Company's efforts generally have been successful.

That is not to say, however, that Boeing Vertol has been completely free from discrimination. Rather, my holding is only that the plaintiffs have failed to prove that Boeing Vertol engaged in a pattern or practice of discrimination, as that term has been defined by the Supreme Court in *International Brotherhood of Teamsters, supra.* This holding consequently does not preclude findings of individual acts of discrimination, and in fact, as is set forth in the remaining portion of this opinion, I have found that some of the individual plaintiffs have proved that they were discriminated against. Although I have considered these individual acts of discrimination to some extent in ruling on the class issues in the case, I have concluded that they were insufficient to establish that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of Teamsters, supra,* 431 U.S. at 336, 97 S.Ct. at 1855.

### Individual Claims

It is important to emphasize at the outset that many of the allegedly discriminatory acts testified to by individual class members occurred before the statute of limitations period. The Supreme Court has held that

1716, 44 L.Ed.2d 295 (1975) (statute of limitations). Not being prescient, plaintiffs presented a great deal of evidence which subsequently has become irrelevant or insufficient to establish liability. This Court has even made findings of fact on matters which ultimately have proved to be of little importance under the law. Such findings have remained in this opinion for whatever value they might have.

such acts cannot be the basis for a finding of liability:

"A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. at 558, 97 S.Ct. at 1888.

In this case, claims based on acts which took place before September 2, 1965 are barred completely by the statute of limitations, and claims based on acts which occurred between September 2, 1965 and March 23, 1968 can only be based on 42 U.S.C. § 1981. Such claims must fail unless purposeful racial discrimination has been proved.

 A second general point is the individual plaintiffs' burden of proof. Since plaintiffs failed to prove class discrimination, the individual plaintiffs are not entitled to any special presumptions which proof of a pattern and practice of discrimination would have created. See *International Brotherhood of Teamsters, supra*, 431 U.S. at 359 n.45, 97 S.Ct. 1843. Thus, individual plaintiffs seeking to establish racial discrimination in hiring or promotions generally must meet the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff makes out a prima facie case under Title VII by showing

 (i) that he belongs to a racial minority;

 (ii) that he applied and was qualified for a job for which the employer was seeking applicants;

 (iii) that, despite his qualifications, he was rejected; and

 (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

If a plaintiff makes out such a prima facie case, liability can still be defeated if the employer establishes a "legitimate, non-discriminatory reason for the employee's rejection." Plaintiffs in turn may show that this reason was only a pretext for discrimination. *Id.*

In deciding whether a particular plaintiff has made out a prima facie case and, if so, whether the Company has effectively rebutted it, questions of credibility often must be resolved. The determinations which follow are based on such resolutions.

*Mamie Croker* Croker's claim of hiring discrimination is barred by the statute of limitations, or insufficient under § 1981,[12] as is any claim of discriminatory layoff based on having insufficient seniority. See *United Air Lines, Inc. v. Evans, supra.*

Croker did present a prima facie case of discrimination in promotion by showing that in 1968 an employee with less seniority and less experience than Croker was placed into a position that was to be reclassified as an A rate job. The Company never rebutted Croker's prima facie case, and consequently Croker must prevail on her claim of promotion discrimination.

 Croker presented overwhelming evidence of harassment by other employees and supervisors at Boeing Vertol. This included unusually close supervision, denied transfer requests, reprimands concerning dress, use of racially demeaning language, and an attempt to prevent Croker from obtaining a promotion. (See Findings of Fact 124–127, *supra*). Much of Croker's testimony was confirmed by Edward Wellock, her shop steward during 1968. (See Finding of Fact 128, *supra*). Although the Company has rebutted only some of Croker's testimony, it has made several legal arguments to avoid liability. First, the company contends that any harassment was for personal reasons, not racial reasons. See *Fekete v. United States Steel Corp.*, 353 F.Supp. 1177, 1186 (W.D.Pa.1973). While it

12. Croker also failed to establish that she was qualified for a position for which a vacancy existed prior to the time she was hired.

is quite likely that Croker's personality contributed to her harassment, I conclude, as did Mr. Wellock, that race was also a cause of the treatment she received, and that therefore she has stated a claim under Title VII. The Company also has argued that it cannot be liable for any harassment of Croker because it cannot be responsible for the actions of its employees. See *United States v. United States Steel Corp.,* 371 F.Supp. 1045, 1054 (N.D.Ala.1973), *modified on other grounds,* 520 F.2d 1043 (5th Cir. 1975). This contention is without merit. Croker has testified to harassment by several different supervisors over several years. An inference that "management" was aware of her mistreatment, or should have been aware, is unavoidable. Boeing Vertol therefore is liable under Title VII. See *Johnson v. Ryder Truck Lines, Inc.,* 10 E.P.D. ¶ 10,535 at 6249, 6251 (W.D.N.C. 1975); *Anderson v. Methodist-Evangelical Hospital,* 4 F.E.P. Cases 35 (W.D.Ken.1971), *aff'd* 464 F.2d 723 (6th Cir. 1972).

*Leolin Dockins* Dockins' claim of hiring discrimination is barred by the statute of limitations or insufficient under § 1981,[13] as is his claim of promotion discrimination in 1967, and any claims based on lost seniority. See *United Air Lines, Inc. v. Evans, supra.*

▇▇▇▇ Dockins did present a prima facie case of discrimination in promotion by showing that he was qualified for a promotion from Maintenance Electronics B to Maintenance Electronics A and that a white, Edward Bailey, was promoted instead. The Company never rebutted this prima facie case, and consequently Dockins must prevail on his claim of promotion discrimination under Title VII. Similarly, the Company has not rebutted Dockins' showing of discrimination in promotion to a leadman position. The evidence showed that Dockins was at least as qualified as Bailey (who was white) yet Bailey was made a leadman despite having less seniority than Dockins.

▇▇▇ Dockins' remaining claims involve alleged discrimination in training and an allegedly discriminatory transfer. The Company showed that Dockins has received a great deal of formal training at Boeing Vertol, and it has offered a satisfactory explanation of Dockins' transfer (i. e.—for training on other equipment). The fact that Dockins was kept on the Management Exempt List supports the Company's contention that Dockins received adequate training and that his transfer was for legitimate training purposes. Dockins has failed to prove racial discrimination in his training or transfer. Finally, Dockins' testimony concerning racially derogatory comments was too vague as to time, place, and persons involved to support a finding of liability.

*Chivis Davis* Chivis Davis claims discrimination in not being promoted to a leadman or supervisory position since 1964. Davis' service as a supervisor negates any inference of intentional discrimination against him. Similarly, Davis has not established that his demotion from supervision was discriminatory in any way. I also find that Davis has not established that he was as qualified for a supervisory position as the employees who were selected. The fact that none of the other supervisors (all of whom were white) who were demoted at the same time as Davis has been reappointed to a supervisory position is probative of non-discrimination in not reappointing Davis.

▇▇▇ On the other hand, the numerous positive evaluations that Davis has received show that he was an above-average employee. Davis has proved that white employees, including some of those demoted from supervision in 1963, have been promoted to leadman positions in the sheetmetal area since March, 1968. Davis has shown that he was qualified for such a promotion, and the Company has failed to rebut his prima facie case of employment discrimination.

---

**13.** Dockins failed to establish that he was as qualified as the whites in his class who were hired before him. The fact that he was hired only two months later tends to rebut any claim of discrimination.

■ Davis' final claim of discrimination was based on the adverse employee reports he received during 1967 and 1968. Davis presented no evidence that these disciplinary actions were the result of his activities on the Black Committee for Progress, nor did he show that any of the employee reports he received were undeserved. His claim of discriminatory harassment must be denied.

■ *Eric P. Travis* Travis' first complaint is that he was discriminatorily denied a promotion to supervision. However, Travis has failed to prove that he was qualified for a supervisory position, and therefore this claim must be rejected.

■ Travis also has made a claim for discriminatory discipline, harassment and retaliation. Some of the evidence on this issue is not persuasive. For example, as to derogatory language used by Jack Proctor, the evidence showed that Proctor used disparaging language to many employees, both white and black. See *Bradford v. Sloan Paper Company, Inc.,* 383 F.Supp. 1157, 1161 (N.D.Ala.1974). However, Travis presented convincing evidence of at least one instance of unjustified disciplinary action that occurred shortly after Travis filed charges of racial discrimination with the EEOC. The employee report given to Travis on July 24, 1968 for improperly marking work as complete was unjustified, and it is reasonable to infer that discipline was given for racially discriminatory reasons, as retaliation for Travis' EEOC complaint. Similar complaints concerning frequent and unnecessary transfers, employee reports for excused absences, and the failure to remove employee reports from Travis' file as required by the collective bargaining agreement also were unrebutted by the Company, and are grounds for liability under Title VII.

■ *Robert W. DeBose* DeBose first complains about the Company's failure to grant his request to transfer to a Quality Control job. Since there is no evidence of purposeful discrimination, DeBose's claim is barred by the statute of limitations because his transfer request was pending only in 1966 and 1967. Moreover, the evidence established that all the vacancies in the position DeBose sought were filled by employees already in the inspection job family. Under the Company's job family seniority system, these persons were to be considered for the vacancies before DeBose. Discriminatory effects arising from the operation of a neutral seniority system are not a basis for imposing liability under Title VII. See *International Brotherhood of Teamsters, supra.* In effect, DeBose has failed to show that a vacancy existed for which he was qualified, since he could not be considered. Moreover, white employees with more seniority than DeBose also were equally unable to transfer because of the Company's prescribed method for filling vacancies.

■ DeBose also contends that he was discriminated against by being denied promotion to a supervisory position. Although DeBose evidently was a good worker, he did not establish that he was qualified for a supervisory position. I accept his supervisor's opinion that he was not so qualified. DeBose's claims of racial discrimination will be denied.

■ *Rudolph Richardson* Richardson alleges that he was discriminated against by being denied transfer to a position as Inspector Fuselage Assembly and by being denied a promotion to Development Mechanic A. In both cases, however the Company's denial of Richardson's request was a function of the normal operation of the job family seniority system, and therefore not a basis for imposing liability under Title VII. See *International Brotherhood of Teamsters, supra.* Inspector Fuselage Assembly positions were filled through promotion requests, so that lateral transfer requests were never considered, and Development Mechanic A positions were filled by the normal progression of Developmental Mechanic B's to A positions. Richardson has failed to prove that he was a victim of racial discrimination.

■ *Dudley Sykes* Sykes claims that he was unlawfully denied employment as a

Project Engineer in 1966. Even if this claim were not barred by the statute of limitations, it would be unsuccessful. Sykes had never had a project engineering position at the time he applied to Boeing Vertol. The fact that the Company was sufficiently impressed with Sykes' resume to arrange an interview does not prove that he was qualified for the job or that he was rejected for discriminatory reasons. Many job applicants are interviewed but not hired. Despite the predominately white racial composition of the engineering payroll, Sykes has failed to meet the *McDonnell-Douglas* test, and is not entitled to a finding of liability in his favor.

■ *William J. Craig* Craig claims that Boeing Vertol discriminatorily failed to hire him in accordance with his qualifications between 1965 and 1967. Craig has not proven that his not being hired was the result of purposeful racial discrimination. An inference of purposeful discrimination might be possible if Craig had established clearly that at the time his application was on file, whites were hired who were less qualified than he. The evidence, however, did not establish the relative qualifications of Craig and the other persons hired. An inference of purposeful racial discrimination also is negated by the evidence that Ms. St. Germaine, the person who rejected Craig, did approve the hiring of other blacks.

Any claim for hiring discrimination that Craig might otherwise be able to assert under Title VII is barred by the statute of limitations.

■ *Donald Ferrell* Ferrell first claims that he was discriminatorily denied a promotion to a supervisory position. The evidence shows that Ferrell had received many positive evaluations and had completed an advance blueprint reading course. The evidence also shows that persons, mostly white, were appointed to supervisory positions for which Ferrell was qualified. Boeing Vertol offered absolutely no evidence to rebut Ferrell's claim of promotion discrimination. Although the evidence does not support a finding of purposeful discrimination under § 1981, I hold that Ferrell has proved by a preponderance of the evidence that he was discriminatorily denied promotion to supervision in violation of Title VII.

■ Ferrell also alleges that his transfer in 1969 to a different work unit was in part motivated by considerations of race. The testimony was to the contrary, however, and established that the transfer was initiated by a black supervisor in order to accommodate a disabled employee. Ferrell has failed to prove that his transfer was due to racial discrimination.

■ *Horace Dixon* Dixon makes various claims of hiring and placement discrimination which are barred by the statute of limitations under Title VII and insufficient under § 1981 because there was no evidence of purposeful racial discrimination. Dixon has established liability under Title VII for the Company's denial of his request in 1968 for a transfer to Machinist B. Dixon showed that he was qualified for such a position and that several whites from outside the Company were hired instead. The Company failed to rebut this prima facie case.

■ Dixon also alleged that he was discriminated against concerning a promotion to a Machinist A position. Dixon was promoted to such a position in October, 1972, but was demoted back to the B classification after one month. In August, 1973 he was again promoted to the A rate, and performed satisfactorily until reduced in a reduction in force. Despite Dixon's testimony that he was qualified for an A position at any time after October, 1972, I conclude from his testimony that he did not perform satisfactorily during his first attempt as a Machinist A. Therefore, the Company was justified in demoting him and in not giving him another opportunity at A work until August, 1973. See *Floyd v. Kroger Company*, 9 E.P.D. ¶ 9897 (S.D.Ohio 1974). The fact that two white employees were demoted at the same time as Dixon and that other whites with more seniority than Dixon remained in the Machinist B

classification throughout this time period also rebuts any inference of discrimination. Dixon has failed to prove that the Company violated Title VII in failing to promote him to a Machinist A position.

■■■■■ *Edward Claiborne* Claiborne's claim concerns his nonpromotion to a position as a Set-up Developer Milling Machine Operator. This position originally was created in 1966. The fact that one of the eight employees originally promoted to this position was black rebuts any possible inference of purposeful racial discrimination under § 1981, and Claiborne cannot make any claim under Title VII for events occurring before March, 1968. Claiborne did not establish that any whites were promoted to Set-up Milling Machine Operator between March, 1968 and the time Claiborne was promoted in 1974. Consequently, Claiborne has failed to meet the *McDonnell-Douglas* test, and his claim of promotion discrimination must be denied.

■■■ *John F. Edwards* Edwards claims that he was discriminated against in not being promoted to a supervisory position in the Transportation Department. Although Edwards did show that he would have been qualified for such a position, the Company showed that Edwards had never applied to be a supervisor, and that he had turned down several promotion offers. Although the law imposes no requirement that Edwards actually have applied for a promotion, *International Brotherhood of Teamsters, supra,* 431 U.S. at 364–367, 97 S.Ct. 1843, his rejection of other promotion opportunities is persuasive evidence that he was not interested in a promotion. See *International Brotherhood of Teamsters, supra* at 367–371, 97 S.Ct. 1843; *Smith v. South Central Bell Telephone Co.,* 518 F.2d 68 (6th Cir. 1975). Edwards' failure to show his interest in a promotion to supervisor rebuts any inference of discrimination and prevents him from meeting one element of the *McDonnell-Douglas* test. Edwards therefore is not entitled to relief.

■■■ *William Banks, Sr.* Banks' claims of placement discrimination are barred by the statute of limitations. Banks also complains of being unable to transfer to a job in the woodworking family after his initial assignment as a janitor. The testimony was not entirely clear concerning Banks' efforts to move to the woodworking family. Nevertheless, even accepting Banks' testimony that he applied for transfer on numerous occasions, Banks is not entitled to a finding in his favor. Banks has not proved that he was qualified for a woodworking job, nor has he established that whites were given priority over him for woodworking jobs, other than through the normal operation of the job family seniority system. Banks has failed to prove that his inability to get a woodworking job was caused by racial discrimination.

■■■ Banks' complaints concerning his non-promotion to a supervisory job also fail to meet the *McDonnell-Douglas* standard. Banks has not proved that he was qualified to be a supervisor or that whites were made supervisors in the Transportation Department at any time when he was qualified. The fact that two of the three supervisors appointed in the Transportation Department between 1969 and 1975 were black effectively rebuts any claim of discrimination during that time. Banks is not entitled to relief.

■■■ *Stanley L. Gladstone, Jr.* Gladstone has charged that he was refused a promotion to a supervisory position in 1966 and reduced from a supervisory position in 1975 because of racial discrimination. Gladstone has failed to prove that these actions were motivated by racial discrimination. Although Ed Marshall, a white, was chosen for a supervisory position instead of Gladstone, Marshall had better credentials for the job. The fact that Marshall failed to live up to expectations does not prove that his selection was improper. Of course, Gladstone produced no evidence of purposeful racial discrimination in the selection of Marshall, and any Title VII claim based on this incident would be barred by the statute of limitations. Gladstone also failed to prove a discriminatory demotion in 1975.

He did not prove that he was still qualified to be a supervisor after suffering a stroke in late 1974, nor did he show that a white who had less seniority or qualifications than Gladstone was retained as a supervisor when Gladstone was demoted.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e–5(f), and 28 U.S.C. §§ 1343(1) and 1343(4).

2. Additional Conclusions of Law, as well as factual findings, appear in the "Discussion" portion of this opinion, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## ORDER

AND NOW, to wit, this 20th day of June, 1977, on the basis of the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED:

1. The Court's Order of August 4, 1972, designating the class in this action is modified, and the class is redesignated as follows:

Under Title VII, all Negro persons who had applications pending for employment with Boeing Vertol on or after March 23, 1968, or who have been employed by Boeing Vertol at any time between March 23, 1968 and June 30, 1975, the date on which trial of this action commenced;

Under 42 U.S.C. §§ 1981, 1985, all Negro persons who had applications pending for employment with Boeing Vertol on or after September 2, 1965, or who had been employed by Boeing Vertol at any time between September 2, 1965 and June 30, 1975, the date on which trial of this action commenced.

2. Judgment is entered in favor of the defendant, The Boeing Vertol Company, and against the plaintiff class on all claims of liability to the class or any subclass under 42 U.S.C. §§ 2000e *et seq.*, 1981 and 1985.

3. Judgment is entered in favor of the defendant, The Boeing Vertol Company, and against individual plaintiffs Robert W. DeBose, Rudolph Richardson, Dudley Sykes, William Craig, Edward Claiborne, John Edwards, William Banks and Stanley Gladstone on all individual claims of discrimination presented by those plaintiffs under 42 U.S.C. §§ 2000e *et seq.*, 1981 and 1985.

4. Defendant Boeing Vertol Company is liable to the following individual members of the plaintiff class for their individual claims as noted:

a. Mamie Croker, for a discriminatory refusal to promote in 1968, in violation of 42 U.S.C. § 2000 *et seq.*, and for discriminatory harassment in violation of 42 U.S.C. §§ 2000e *et seq.* and 1981.

b. Leolin Dockins, for a discriminatory refusal to promote to Maintenance Electrician A and to a leadman position in violation of 42 U.S.C. § 2000e *et seq.*

c. Chivis Davis, for a discriminatory refusal to promote to a leadman position in violation of 42 U.S.C. § 2000e *et seq.*

d. Eric Travis, for discriminatory discipline, harassment and retaliation in violation of 42 U.S.C. §§ 2000e *et seq.* and 1981.

e. Donald Ferrell, for a discriminatory refusal to promote to a supervisory position in violation of 42 U.S.C. § 2000e *et seq.*

f. Horace Dixon, for a discriminatory denial of a transfer request in violation of 42 U.S.C. § 2000e *et seq.*

5. Judgment is entered in favor of defendant Boeing Vertol Company, and against plaintiffs Mamie Croker, Leolin Dockins, Chivis Davis, Eric Travis, Donald Ferrell and Horace Dixon on all individual claims of discrimination presented by those plaintiffs, under 42 U.S.C. §§ 2000e *et seq.*, 1981 and 1985, with the exception of those claims specifically identified in paragraph 4, *supra.*

6. Further proceedings will be necessary in order to determine the appropriate relief for those individual plaintiffs who have prevailed on individual claims, and to resolve questions concerning the possible award of costs and attorneys' fees.

AND IT IS SO ORDERED.